**CHARLES LEICH AND COMPANY**

v.

**The UNITED STATES.**

**Nos. 367–56, 419–56.**

United States Court of Claims.

March 13, 1964.

Henry B. Walker, Jr., Evansville, Ind., for plaintiff.

David D. Rosenstein, Chicago, Ill., with whom was Asst. Atty. Gen., Louis F. Oberdorfer, for defendant. Edward S. Smith, Lyle M. Turner, and Philip R. Miller, Washington, D. C., on the brief.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

LARAMORE, Judge:

These are related actions brought by the same taxpayer. The cases were tried separately, but were consolidated for oral argument since they both arise from the same factual situations. In Case No. 367–56, taxpayer seeks to recover $14,-403.14 in interest on amounts of Federal income and excess profits taxes, together with interest thereon, allegedly overpaid in fiscal years ending April 30, 1952 and 1953. The issue involved in this case is whether the amounts remitted were "overpayments" within the meaning of section 3771(a) of the Internal Revenue Code of 1939, so as to entitle taxpayer to interest when these amounts were refunded in 1955.[1]

In Case No. 419–56, taxpayer seeks to recover $47,483.09 as alleged overpayments of Federal income and excess profits taxes for fiscal years ending April 30, 1951, 1952, 1953 and 1954. Taxpayer's claims are based on two separate claims for refund. First, taxpayer claims that for the fiscal years ending April 30, 1952 and 1953, the Commissioner of Internal Revenue erroneously and illegally disallowed deductions for interest allegedly paid in each of said years in connection with Federal income and excess profits taxes allegedly overpaid in the years 1952 and 1953. Second, taxpayer claims that the Commissioner erroneously and illegally did not allow it to use the "historical method" of computing its invested capital in determining its excess profits credit which denial allegedly resulted in an overpayment of taxes for the years ending April 30, 1951 through 1954. We shall treat each case separately.

A. *Case No. 367–56*

The facts in this case have been stipulated; it is the legal conclusion from them which is the subject of controversy. The Commissioner of Internal Revenue determined and assessed a deficiency in taxpayer's excess profits tax for the fiscal year ending April 30, 1942. This assessed deficiency, with interest, was duly paid on February 21, 1949. Taxpayer filed a timely claim for refund. On April 3, 1950, as the Commissioner had taken no formal action with respect to this claim, taxpayer instituted a suit for refund in the U. S. District Court for the Southern District of Indiana.

Shortly thereafter, a revenue agent's report for the taxpayer's fiscal years 1943–1949, dated June 13, 1950, proposed adjustments in taxpayer's income and excess profits tax for those years. The adjustments proposed would be in conformity with the position taken by the Commissioner in the pending litigation for the year 1942, with respect to the proper computation of taxpayer's invested capital. The net result of the proposed adjustments would have been an overall deficiency of $66,639.80. Taxpayer filed a protest to the proposed adjustments for the years 1943–1949 with the District Director, requesting that the case be forwarded to the technical staff of the Internal Revenue Service. Taxpayer was advised by the Internal Revenue Service that consideration of its protest would be held in abeyance pending the outcome of the litigation involving the suit for refund of 1942 taxes, since the ultimate decision of the District Court as to the 1942 taxes would be controlling as to virtually all of the points on which the proposed deficiencies for 1943 through 1949 were based.

Subsequently, on February 13, 1952, the District Court entered judgment for the Government in the refund suit involving fiscal year 1942. On February 23, 1952, taxpayer filed a motion for a new trial, together with a motion requesting the amendment of the findings of fact and conclusions of law. While these motions were pending, taxpayer

1. Section 3771(a) of the Internal Revenue Code of 1939, provides that "[i]nterest shall be allowed and paid upon any over- payment in respect of any internal revenue tax at the rate of 6 per centum per annum."

on March 15, 1952 remitted to the then Collector of Internal Revenue the sum of $75,000 in respect of the proposed adjustments contained in the Revenue Agent's report. Part of the sum remitted consisted of alleged interest on the proposed deficiency, which amount ($14,276.50) taxpayer deducted as interest expense on its Federal income and excess profits tax returns for the fiscal year ended April 30, 1952. On April 10, 1952, taxpayer filed amendments to the above referred motions. On April 2, 1953, the District Court denied said motions. On April 30, 1953, taxpayer remitted to the then appropriate Collector of Internal Revenue the sum of $12,444.13, representing interest allegedly due on the proposed deficiency for years 1943 through 1949. Taxpayer deducted this amount as an interest expense in its income and excess profits tax returns for the fiscal year 1953.

During the period that the issue with respect to year 1942 was being litigated, taxpayer never signed a waiver agreeing to the assessment of all or any part of the proposed deficiency; no statutory notice of deficiency was ever issued as to all or any part thereof; and no part of the proposed deficiency was assessed by the Commissioner of Internal Revenue.

Taxpayer filed its notice of appeal from the judgment of the District Court, and on February 26, 1954, the U. S. Court of Appeals for the Seventh Circuit reversed the District Court's decision. The litigation was concluded a year later when taxpayer obtained a judgment against the United States in the District Court. Subsequently, taxpayer filed claim for refund for $87,444.13, which purportedly represented overpayments of tax for the years 1943–1949, together with interest thereon. Interest on the

refund was also demanded. On March 2, 1955, the Internal Revenue Service refunded these amounts;[2] however, no statutory interest was allowed with respect to the alleged "overpayments" in question.

■ It is this claim for statutory interest which is the subject matter of taxpayer's petition No. 367–56. Taxpayer's entitlement to the statutory interest under the provisions of section 3771(a) of the Internal Revenue Code of 1939 depends on whether or not the amounts remitted constituted an *"overpayment* in respect of any internal revenue tax * * *."* (emphasis added) We believe that the amounts remitted by taxpayer did not constitute payments of tax, consequently taxpayer is not entitled to statutory interest when said amounts were subsequently refunded.

The problem of what constitutes a "payment" of tax within the meaning of the Internal Revenue Code has been the subject matter of extensive litigation, but the courts when confronted with this question have failed to reach uniform results even under similar factual situations.[3] The state of the law with respect to what constitutes a "payment" was thrown into further confusion when Congress, in amending section 3770 of the 1939 Code, added subsection (c) providing that:[4]

"(c) *Rule where no tax liability.* An amount paid as tax shall *not* be considered *not* to constitute an overpayment solely by reason of the fact that there was no tax liability in respect of which such amount was paid." [emphasis added]

The basic factual situation which gives rise to the problem is quite simple. A taxpayer places in the hands of the Com-

2. By two checks dated March 2, 1955, taxpayer was refunded $72,937.87 and $12,-444.13, both sums without interest. The check for $72,937.87 represented a refund of the amounts ($75,000) remitted in March 15, 1952, less a net deficiency, not here in controversy, of $2,062.43. The check for $12,444.13 represented a refund of the amount remitted on April 30, 1953.

3. Compare *Atlantic Oil Producing Co.* v. *United States*, 35 F.Supp. 766, 92 Ct.Cl. 441 (1940) with *Busser* v. *United States*, 130 F.2d 537 (3rd Cir. 1942).

4. Current Tax Payment Act of 1943, 57 Stat. 126, 140.

missioner of Internal Revenue an amount of money. The question whether the remittance is a payment of tax or a mere deposit to stop the running of interest is complicated by the widely differing circumstances which prompt taxpayers to take such action. These surrounding factors are usually determinative of the question whether the remittance is a payment or a deposit.

Before we examine the decided cases in this area, we must point out that what is considered a payment for a specific purpose in the Internal Revenue Code must also be viewed as such in all of the contexts in which the question of "payment" might arise in the Code. This consistent treatment of the term payment is required by the Supreme Court decision in Rosenman v. United States, 323 U.S. 658, 663, 65 S.Ct. 536, 89 L.Ed. 535 (1945).

■ It seems clear that a remittance made by a taxpayer of an amount shown in good faith to be due on its tax return or given in response to an assessment of taxes by the Internal Revenue Service is a payment of tax. Thus, the problem area may be limited to the situation in which a taxpayer makes a remittance of an amount not shown to be due on its return and which has not been assessed by the Commissioner.

■ Congress, in enacting section 3770(c), made use of a double negative. This subsection seems to indicate that the fact that there has been no assessment or tax return which sets forth the tax liability should not of *itself* negate "payment". There must be other factors present which, taken in conjunction with the fact of no tax liability, have the effect of negating "payment". In

Reading Co. v. United States, 98 F.Supp. 598, 599–600, 120 Ct.Cl. 223, 231 (1951), we said that this subsection was enacted "because some decisions holding that remittances not made incident to a bona fide and orderly discharge of the taxpayers' actual or reasonably apparent duties had been read by some as meaning that no tax payment resulted if no tax liability actually existed." [5] In that opinion, we noted that where the taxpayer merely dumped money as taxes on the collector by disorderly remittances taken in conjunction with no tax liability, no payment of tax resulted. See also Moskowitz v. United States, 285 F.2d 451, 152 Ct.Cl. 412 (1961). Taxpayer contends that a disorderly remittance or a lack thereof is the only factor which need be considered by the court in determining whether a remittance is a payment or a mere deposit. We believe this to be an erroneous oversimplification.

Taxpayer relies in the opinions of this court in Atlantic Oil Producing Co. v. United States, 35 F.Supp. 766, 92 Ct.Cl. 441 (1940); Hanley v. United States, 63 F.Supp. 73, 105 Ct.Cl. 638 (1945); Reading Co. v. United States, 98 F.Supp. 598, 120 Ct.Cl. 223 (1951). In those cases we held that where a taxpayer has made a voluntary remittance based upon a bona fide estimate of tax then due, a payment of tax resulted even though the time of filing the appropriate tax return had been extended.[6] We reasoned that these remittances were made in respect of Internal Revenue taxes then *due* but the amounts of which had not been ascertained. In none of the above cited cases were there any other "factors" present which might negate payment. These cases are clearly distinguishable from the case at bar.

---

5. For a more narrow construction of the statutory enactment see Murphy v. United States, 78 F.Supp. 236 (S.D.Cal.1948) where the court stated that Congress intended that section 3770(c) only applied to situations where taxpayer in good faith overpaid his taxes in its tax return or the Commissioner made an erroneous assessment. See also Manee v. United States, 97 F.Supp. 993 (S.D.N.Y.1951).

6. A contrary result under similar facts was reached in Busser v. United States, 130 F.2d 537 (3d Cir. 1942); Moses v. United States, 28 F.Supp. 817 (S.D.N.Y.1939). These holdings seem to be based on the false premise that no tax was due at the time the remittances were made.

In each of the above cited cases there was a tax *due* on the due date and taxpayer was offering on due date an amount calculated by him in good faith to be the amount of tax due. The only extension of time granted was the time for filing the return. Taxpayers *at all times* admitted that they were liable for some tax but the exact amount of which had yet to be calculated. In those cases, there was no reason to give a different treatment to a taxpayer remitting on due date a tax calculated in good faith from that given to a taxpayer making a payment concurrently with a tax return filed on the due date. There taxpayers were not making disorderly remittances nor were they contesting the liability. Cf. United States v. Miller, 315 F.2d 354 (10th Cir. 1963). See Rosenman v. United States, supra, where taxpayer remitted the amounts under protest and duress and specifically stated that the amounts remitted were only for the purpose of stopping the running of interest. See also Manee v. United States, 97 F.Supp. 993 (S.D.N.Y.1951), where the executor filed an estate tax return showing no estate tax liability and at the same time sent check stating that it was not payment of tax due but estimated tax liability which would result if the estate was successful in pending litigation.

In the instant situation, the circumstances which followed and prompted taxpayer to make the alleged ".payments of tax" were entirely different. There is no dispute that the Government never made an assessment. Therefore, taxpayer was never required to pay the tax for there was never an obligation imposed by law to pay any tax. The remittances made were entirely voluntary. Thus, the factor of no tax liability was present. Furthermore, it is clear that throughout the entire period taxpayer was contesting the proposed liability. We believe that the factors of "contest," coupled with the fact of no assessment, are sufficient to negate "payment" in the instant case. Our holding here is not inconsistent with our hold-ings in the Atlantic Oil, Hanley, and Reading Co. decisions for there the taxpayers did not negate "payment" by simultaneous contest. Here, as was the case in Lewyt Corp. v. Commissioner, 2 Cir., 215 F.2d 518, 522–523.

> "[t]he taxpayer was not entitled to have these remittances treated as a satisfaction of its tax liabilities * * * and at the same time continue to contest such liabilities * *.
>
> * * * * * *
>
> "* * * Here the taxpayer was tendering its check with one hand, and contesting its liability to pay with the other."

Cf. Murphy v. United States, 78 F.Supp. 236 (S.D.Cal.1948); Richardson v. Smith, 196 F.Supp. 432 (E.D.Pa.1961), aff'd per curiam 301 F.2d 305 (3d Cir. 1962).

Taxpayer argues that it was not contesting its liability for the years 1943–1949 in the 1942 suit, therefore the contest factor was not present and his case comes within our holdings in Atlantic Oil, Hanley, and Reading Co. cases, since each tax year must be treated as a separate unit. However, we cannot apply this reasoning to the instant case, since there is no dispute that the issues involved in the District Court for the 1942 tax year would be controlling and determinative as to the issues involved for years 1943 through 1949. Therefore, under the principles laid down in Commissioner v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948), taxpayer would be collaterally estopped from raising the same issues again. Consequently, by the fact that taxpayer was litigating the assessed deficiency for 1942, taxpayer was also contesting its liability for the years 1943 through 1949.

We hold that the remittances made by this taxpayer in 1952 and 1953 were not "overpayment[s] in respect of any internal revenue tax" but rather were mere deposits in the nature of a cash bond. Consequently, taxpayer is not entitled to statutory interest when they were refunded and his petition in Case No. 367–56 is dismissed.

## B. *Case No.* 419-56

As stated previously, taxpayer's claims in this case are based on two separate claims for refund. First, taxpayer asserts that for fiscal years ending April 30, 1952 and 1953, the Commissioner erroneously disallowed deductions for interest allegedly paid in each of said years in connection with Federal income and excess profits taxes allegedly overpaid in the years 1952 and 1953. These are the same remittances which were the subject matter of Case No. 367-56 and which taxpayer claimed to be payments of tax. Taxpayer, in its income and excess profits tax returns for the years in issue, deducted as an interest expense that portion of the remittance which represented interest. The Commissioner disallowed the deduction and assessed a deficiency which was duly paid. Taxpayer filed a timely claim for refund. Six months having elapsed from the filing of said claim with no administrative determination on it, taxpayer brought suit in this court alleging an overpayment of tax resulting from the erroneous disallowance of the interest deduction.

■ Since in Case No. 367-56 we held that the remittances made by the taxpayer in 1952 and 1953 did not constitute "payments" of tax but were deposits in the nature of cash bonds in order to stop the running of interest, it follows, *a fortiori*, that the portion of the remittances which represented interest were not "paid" in those years and consequently could not be deducted as an interest expense in those years. Thus this portion of taxpayer's claim for refund in Case No. 419-56 must be dismissed.

Second, taxpayer claims that the Commissioner erroneously and illegally did not allow it to use the "historical method" of computing its invested capital in determining its excess profits credit for the taxable years 1951 through 1954. Taxpayer claims that this denial

resulted in an overpayment by it of taxes for the years in issue.

Taxpayer, on its original excess profits tax returns for the fiscal years ended April 30, 1951 through 1954, computed its excess profits tax credit on the income method as was provided by section 435 of the 1939 Code.[7] After the judgment of the U. S. District Court for the Southern District of Indiana had resolved in taxpayer's favor the amount of equity invested capital, in June 1955 taxpayer filed amended tax returns for fiscal years ending April 30, 1951 through 1954, using the "historical method" of computing its invested capital in determining its excess profits credit as provided by sections 436, 437, and 458 of the 1939 Code. The claims for refund were denied by the Commissioner and taxpayer has brought suit.

■ Defendant contends that taxpayer did not make a timely election to use the "historical method" for computing its invested capital. Specifically, defendant asserts that section 437(b) (1) requires a taxpayer, electing to compute its invested capital by the use of the historical method under section 458, to make such an election by attaching a statement to that effect to its return for the tax year in which the election is made. The defendant as an affirmative defense asserts that taxpayer's claim for refund with respect to the taxable year ending April 30, 1951 was not timely filed. Taxpayer on brief admits that its claim for fiscal year ended April 30, 1951 was not timely filed and is effective only to the extent the refund is due to a carryback of the unused excess profits credit, if any, for the fiscal year ended April 30, 1952. See Internal Revenue Code of 1939, section 322(b) (6).

Thus, the only question remaining before us is whether the taxpayer, by filing amended returns, properly exercised the election provided in section 437(b) (1)

7. This method permits the taxpayer to take the average of its income as adjusted during the base periods (1946-1949) and to apply that amount as a credit in order to determine the amount of excessive profits subject to taxation under the Excess Profits Tax Act of 1950, 64 Stat. 1137.

of the Internal Revenue Code of 1939 for years .1952 through 1954. We believe he did.

Under the Excess Profits Tax Act of 1950, 64 Stat. 1137, taxpayers have two possible elections to make in determining their excess profits credit. The first election is provided in section 434(a),[8] of the 1939 Code which allows the excess profits credit for any taxable year to be computed under section 435 or 436 whichever produces a lesser tax. Section 435 sets forth a formula for computing the excess profits credit which is based on the income of the taxpayer. Section 436 provides a formula for computing the excess profits credits which is based upon the normal return on the invested capital of the taxpayer. There is no time limit placed upon the election set forth in section 434, to compute the excess profits credit either under the income method or the invested capital method. Indeed the language of section 434 requires that the excess profits credit be computed under the method which "results in the lesser tax * * *." Similar language under the Excess Profits Act of 1940, section 712(a), 54 Stat. 975, 979, was held to offer no choice to the taxpayer and on the contrary required the use of that method which resulted in a lesser tax. Babcock & Wilcox Co. v. Pedrick, 98 F.Supp. 548 (S.D.N.Y. 1951), aff'd 212 F.2d 645 (2d Cir. 1954).

In using the invested capital method, section 437(b) (1) gives taxpayer an election in computing the amount of invested capital. One method is the "net assets" approach which views invested capital from the standpoint of the current balance sheet as the difference between total assets and total liabilities. The other, referred to as the "historical method," ascertains invested capital by tracing it historically since the organization of the corporation, consisting generally of the capital paid into the business plus retained earnings. 7A Mertens, Law of Federal Income Taxation, section 42.194 (Rev.Ed.). Subsection 437(b) (1) prescribes the manner in which the election, as to the method to be used in computing invested capital, is to be made. It provides, in pertinent part, as follows:

"§ 437. *Invested Capital Credit*

\* \* \* \* \* \*

"(b) *Invested capital.*

"(1) Election of taxpayer. The invested capital for any taxable year shall be the adjusted invested capital determined under paragraph (2), except that if the taxpayer elects *in its return for such taxable year* to compute its invested capital under the provisions of section 458, the invested capital for such year shall be the historical invested capital determined under section 458. \* \* \*" [emphasis added]

Treasury Regulation 130, section 40.-437–2(c), sets forth the manner of making this election and the binding effects of such, as follows:

Sec. 40.437–2. *Invested Capital.*—

\* \* \* \* \* \*

"(c) *Election to use historical invested capital.* If the taxpayer \* \* \* elects on its return for the taxable year to compute its invested capital under the provisions of section 458, the invested capital of the taxpayer for such year shall be the historical invested capital determined under section 458. A separate election must be made for each taxable year, and an election once made is irrevocable with respect to

8. Section 434(a) provides as follows:
   Sec. 434. *Excess Profits Credit.—allowance.*
   "(a) Domestic corporations. In the case of a domestic corporation, the excess profits credit for any taxable year shall be an amount computed under section 435 or section 436, *whichever amount results in the lesser tax* under this subchapter for the taxable year for which the tax under this subchapter is being computed." [emphasis added]

the taxable year. A taxpayer making such election may not thereafter compute invested capital for the taxable year under section 437(b) (2). If the historical method is used on the return in determining the excess profits tax liability, the taxpayer will be deemed to have elected the historical method. A taxpayer which computes its excess profits tax on its return on the basis of a credit other than the invested capital credit may nevertheless elect the historical method for such year, in the event that the invested capital credit should subsequently become significant in the determination of its excess profits tax liability for such year, by attaching *to its return for the taxable year* a statement electing the historical method." [emphasis added]

The Government attaches special significance to the concluding phrase of the last sentence of this regulation. It argues that this regulation requires that the sole and exclusive means by which an election to use the "historical method" is made, is by attaching to its *original* return for the taxable year a statement electing the historical method even if the taxpayer had used the "income method" of computing its excess profits credit. It cites as its sole authority directly on point 7A Mertens, supra, section 42.194.[9] This authority interprets the above regulation as preventing a taxpayer from electing the "historical method" by the use of an amended return even though the return as originally filed employed the "income method" for computing the credit and the taxpayer subsequently desires to adopt the "invested capital" method. The Government's interpretation of the regulation and statute is entirely premised on the meaning which it attaches to the words "to its return for the taxable year." The Government takes the word *"return"* and gives it the meaning of *"first return"* and thus it argues that an election cannot be effectuated by an

amended return. We cannot subscribe to such a narrow interpretation of the statute and regulation. Neither the statute nor the regulation speak in terms of "first return." Indeed, a timely amended return has been held to be a "first return" under a statute requiring taxpayer to make an election in its *first return*. Haggar Co. v. Helvering, 308 U.S. 389, 395, 60 S.Ct. 337, 84 L.Ed. 340 (1940). See also J. E. Riley Investment Co. v. United States, 311 U.S. 55, 58, 61 S.Ct. 95, 85 L.Ed. 36 (1940). Consequently, we must hold that taxpayer by filing timely amended returns electing to compute its excess profits tax credit by the use of the invested capital method, can validly elect to use the "historical method" to determine its invested capital for those years in which taxpayer timely filed amended returns, i. e., 1952, 1953, 1954.

█ It is clear that taxpayer can shift from the "income method" to the "invested capital method" or from the latter to the former at any time up to the expiration of the period of limitations for the years involved. Indeed he is entitled to use whichever method results in a lesser tax. Internal Revenue Code of 1939, section 434(a). As stated above, this language under the prior act has been held to be mandatory. Babcock & Wilcox Co. v. Pedrick, supra. However, it appears that such a shift is not permitted within the invested capital method, since once taxpayer elects to use the "historical method" he is bound by the election and cannot use the "net assets" approach. This is required by section 437(b) (1) and Treasury Regulation 130, supra. However, it appears that a shift from the "net assets" approach to the historical method would be permissible under the statute and regulation since the only irrevocable election mentioned is with respect to the "historical method."

It would be anomalous indeed if taxpayer could shift within the "invested capital method" from the "net assets" approach to the "historical method" but

9. Contra, P–H, Excess Profits Tax Under Internal Revenue Code of 1939, par. 45,776.

could not, under the Government's interpretation, elect to use the "historical method" when shifting from the "income method" to the "invested capital" method unless it elected to use the "historical method" to compute its invested capital on its original return. Moreover, if the taxpayer follows this procedure, it could never use the "net assets" approach to compute its invested capital since an election to use the "historical method" would be irrevocable.

The regulation clearly contemplates that a taxpayer using the "income method" may in the future be able to shift to the "invested capital" method and elect to use the "historical method" in computing its invested capital if the invested capital credit should subsequently become significant. This is exactly the situation with which we are confronted. Taxpayer's amount of equity invested capital for the years 1942 to 1949 was in dispute. As stated above, the "historical method" of computing invested capital ascertains invested capital by tracing it historically since the organization of the corporation. After the litigation which determined taxpayer's invested equity was concluded, the invested capital credit became significant in the determination of its excess profits tax liability for those years not barred by the statute of limitations.

Consequently, to construe the statute and regulation as requiring an election "on the first paper filed as a return, as distinguished from the paper containing a timely amendment, which, when filed is commonly known as *the return for the year for which it is filed,* is to defeat" a statutory right to an election, by giving a too narrow construction of the statute "in violation of the most elementary principles of statutory construction." Haggar Co. v. Helvering, supra at 396. [emphasis added]

Therefore, it is the opinion of the court that plaintiff is entitled to recover on this portion of Case No. 419–56, and the amount of recovery will be determined pursuant to Rule 38(c).