TURTLE WAX, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 711-63. Filed January 26, 1965.

*George L. Weisbard, Helmut Strauss,* and *Paul Kessler,* for the petitioner.

*Kenneth B. Samuels,* for the respondent.

OPINION

ARUNDELL, *Judge:* Respondent determined deficiencies in income tax for the calendar years 1958 and 1959 in the amounts of $30,584.16 and $7,344.88, respectively.

Petitioner has assigned two errors, as follows:

(a) In determining the taxable income of the petitioner for the years 1958 and 1959 the Commissioner erroneously included the amounts of $40,422.18 and $9,153.94 respectively, contending that said amounts constituted taxable refunds of excise taxes.

(b) In determining the taxable income of the petitioner for the years 1958 and 1959 the Commissioner erroneously disallowed deductions of $7,393.80 and $2,467.33, respectively, for accrued vacation pay liability.

All of the facts were stipulated.

Petitioner is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Chicago. Petitioner is engaged in the business of manufacturing and selling waxes, polishes, and automotive and household chemicals. It keeps its books and prepares its Federal income tax returns on a calendar year basis and on an accrual method of accounting.. It filed its Federal income tax returns for the taxable years 1958 and 1959 with the district director of internal revenue in Chicago.

During the calendar years 1954 through 1956 petitioner purchased watches from the Gruen, Helbros, and Benrus watch companies which petitioner used as premiums in its sales promotional campaigns. As part of the invoice price of these watches, there was included an amount equal to and designated as the 10-percent Federal excise tax on each watch. The cost of the watches was absorbed by petitioner in the selling price of its products to its customers. That portion of the invoice price attributable to the Federal excise tax was deducted on

petitioner's Federal income tax returns for each of the years 1954, 1955, and 1956 as "Premiums."

Petitioner stamped on the reverse side of said checks issued in payment of the full invoice price of said watches the following statement: "F.E.T. Paid Under Protest." The said watch companies endorsed and deposited in their respective bank accounts each of said checks, including the amount attributable to the excise tax.

After payments for these watches were made by petitioner to the Gruen, Helbros, and Benrus watch companies, said watch companies remitted to the district director of internal revenue in the respective districts in which said watch companies were located payments of Federal excise taxes collected from petitioner as part of the payment for said watches. Prior to 1958, no action was taken by petitioner or said watch companies to seek a refund of the purchase price of said watches attributable to the Federal excise tax.

On its income tax return for each of the calendar years 1954, 1955, and 1956 petitioner deducted the following amounts attributable to the Federal excise tax included as part of the invoice price of said watches:

| Year | Amount |
|---|---|
| 1954 | $38, 547. 09 |
| 1955 | 9, 721. 80 |
| 1956 | 1, 307. 23 |
| Total | 49, 576. 12 |

Petitioner received a Federal income tax benefit from the $38,547.09 deduction taken in 1954, the $9,721.80 deduction taken in 1955, and the $1,307.23 deduction taken in 1956. Each of these amounts was deducted from what otherwise would have been taxable income.

During the year 1958 petitioner informed said watch companies that it was entitled to a refund of that portion of the purchase price of said watches attributable to the 10-percent Federal excise tax, and requested said watch companies to file claims for refund in its behalf.

During the years 1958 and 1959, Benrus, Helbros, and Gruen watch companies each filed a claim for refund of said excise taxes paid, plus interest, in the following total amounts:

| Year | Tax | Interest | Total |
|---|---|---|---|
| 1958 | $40, 422. 18 | $4, 335. 48 | $44, 757. 66 |
| 1959 | 9, 153. 94 | 2, 493. 58 | 11, 647. 52 |
| Total | 49, 576. 12 | 6, 829. 06 | 56, 405. 18 |

The claims for refund of excise taxes were approved, and amounts reflected on said claims together with interest thereon were paid to the said watch companies, and remitted by said companies to petitioner in the following years and amounts:

| Year | Refund of tax | Interest |
|------|--------------:|---------:|
| 1958 | $40,422.18 | $4,335.48 |
| 1959 | 9,153.94 | 2,493.58 |

Petitioner has conceded that the interest on said refunds is taxable and deficiencies in tax attributable to the refund of interest for the years 1958 and 1959 have been assessed.

Petitioner did not include in its Federal income tax returns for the taxable years 1958 or 1959 or any other year all or any part of the refunded excise taxes.

In a statement attached to the deficiency notice the respondent advised petitioner as follows:

It is determined that the sums of $44,757.66 and $11,647.52 received by you during the taxable years 1958 and 1959, respectively, said sums representing refunds, plus interest, of amounts paid in the years 1954, 1955, and 1956 for merchandise purchased, are taxable as ordinary income. Since you failed to report such income in your returns filed, your taxable income is increased in the amounts of $44,757.66 and $11,647.52 for the years 1958 and 1959, respectively.

Prior to 1958 petitioner followed the practice of deducting on its books and Federal income tax returns vacation pay to its union and nonunion employees in the years in which the vacation payments were made.

On October 1, 1958, petitioner entered into a contract with the Industrial Production and Sales Workers Union, Local 4, AFL-CIO. Article VI of said contract provides as follows:

*Section 1.* All employees employed for one (1) year prior to May 1st of the year in which the vacation period is scheduled shall receive a one (1) week vacation with pay computed at forty (40) times the employee's straight time rate.

*Section 2.* All employees who have been continuously employed by the Company for two (2) years or more prior to May 1st of the year in which the vacation period is scheduled shall receive a two weeks' vacation with pay computed at eighty (80) times their straight time hourly rate.

*Section 3.* All employees must have worked a minimum of eighteen hundred (1,800) hours exclusive of overtime in the year preceding May 1st of the year in which the vacation is scheduled in order to be entitled to their vacation pay.

*Section 4.* The Company reserves the right to shut down the plant or to prepare staggered vacation schedules.

*Section 5.* Vacations shall be assigned, insofar as possible, during the months of June, July, August and September.

There was no written contract between petitioner and its nonunion employees during either the year 1958 or 1959.

Petitioner accrued and deducted on its Federal income tax return for 1958, $7,393.80 of vacation pay in excess of the amount actually paid during that year. This amount represented the cost of vacations which petitioner believed would be taken by union employees in 1959

under the terms of the 1958 contract with the union, and by nonunion employees.

Petitioner accrued and deducted on its Federal income tax return for the year 1959, $2,467.33 of vacation pay in excess of the amount paid in that year. This amount represented the cost of vacations which petitioner believed would be taken by union employees in 1960 under the terms of the 1958 contract with the union, and by nonunion employees.

In the notice of deficiency, respondent allowed as a deduction that amount of vacation pay actually paid in the years 1958 and 1959, and disallowed only that portion of vacation pay which was deducted in petitioner's returns but not paid during each of the taxable years 1958 and 1959.

Permission was neither requested by petitioner nor obtained from the respondent for petitioner's change from the cash method of deducting vacation pay to the accrual method of deducting vacation pay adopted by petitioner in 1958.

In a statement attached to the deficiency notice the respondent advised petitioner as follows:

It has been determined that the deductions claimed on your returns for the years 1958 and 1959 are overstated in the amounts of $7,393.80 and $2,467.33, respectively, which amounts represent excess accrual of vacation pay expense.

Regarding the first issue petitioner contends that the facts here are indistinguishable from those in *United States* v. *Consolidated Edison Co.*, 366 U.S. 380 (1961), and that the decision in that case is controlling and determinative of the issue at bar. In support of this conclusion petitioner has presented three points: (1) That the excise tax never accrued; (2) that the refund is not income under section 61(a) of the Internal Revenue Code of 1954; and (3) that the refund has no tax significance other than to affirm the lack of liability in the first place.

Respondent contends that even if we assume, *arguendo*, that *Consolidated Edison* might have lent some support in the past to petitioner's position, that case has been effectively overruled, both prospectively and retrospectively, by the provisions of section 223 of the Revenue Act of 1964 (Pub. L. 88–272, 78 Stat. 19), the material portion of which is in the margin.[1] The purpose of section 223 as stated by the Senate Finance Committee in S. Rept. No. 830, 88th Cong., 2d

---

[1] SEC. 223. TIMING OF DEDUCTIONS IN CERTAIN CASES WHERE ASSERTED LIABILITIES ARE CONTESTED.

(a) TAXABLE YEAR OF DEDUCTION.—

(1) Section 461 (relating to general rule for taxable year of deduction) is amended by adding at the end thereof the following new subsection:

"(f) CONTESTED LIABILITIES.—If—

"(1) the taxpayer contests an asserted liability,

"(2) the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability,

Sess., p. 100 (1964), is also in the margin, with the footnotes omitted.[2] Substantially the same comments were made by the committee at page 243 of the same report.

We believe that the mere citation of section 223, *supra*, and the committee report accompanying the section is sufficient to sustain the respondent's determination that the refunds of $40,422.18 and $9,153.94 received by petitioner in 1958 and 1959, respectively, were taxable to petitioner as ordinary income in those respective years.

Petitioner in its reply brief recognizes that section 223, *supra*, changes the general rule of law announced in *Consolidated Edison*, *supra*, but that under the decision rendered by the U.S. Court of Claims on June 12, 1964, in *Charles Leich & Co.* v. *United States*, 333 F. 2d 871, denying the taxpayer's motion for rehearing and to amend the judgment in the same case reported at 329 F. 2d 649, the new law enacted by section 223 "is not applicable to the particular facts of this case."

We do not agree. The *Leich* case is not in point. In that case a taxpayer in 1952 and 1953 voluntarily remitted certain funds to the

---

"(3) the contest with respect to the asserted liability exists after the time of the transfer, and

"(4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer (or for an earlier taxabble year),

then the deduction shall be allowed for the taxable year of the transfer. * * *"

\* \* \* \* \* \* \*

(b) EFFECTIVE DATES.—Except as provided in subsections (c) and (d)—

(1) the amendment made by subsection (a)(1) shall apply to taxable years beginning after December 31, 1953, and ending after August 16, 1954, * * *

[2] *Present law.*—Prior to the decision in the *Consolidated Edison* case[1] the Internal Revenue Service generally held that the payment of a contested tax liability resulted in the tax being considered as deductible even though the tax was still being vigorously denied and contested.[3] In the *Consolidated Edison* case decided in 1961 the Supreme Court held that a contested tax even when paid does not accrue as a deduction for income tax purposes until the contest is terminated. It was held that the tax was not deductible until after the contest was settled because all of the events which would determine whether or not the amount would ultimately have to be paid would not be determined until that time.

(b) *General reasons for provision.*—Although your committee does not question the legal doctrine laid down by the Supreme Court in the *Consolidated Edison* case, it believes that it is unfortunate to deny taxpayers a deduction with respect to an item where the payment has actually been made, even though the liability is still being contested either as to amount or as to the item itself. * * * Your committee believes that allowing the deduction of items in the year paid, even though they are still being contested in the courts or otherwise, more realistically matches these deductions up with the income to which they relate than would the postponement of the deduction, perhaps for several years, until the contest is settled. *To the extent that deductions are allowed under this rule and then subsequently as a result of the contest the items were found not to be payable, adjustment can be made for this overstatement of the deduction by the inclusion of the overstatement in income in the year in which the amount of the liability is finally determined.*

(c) *General explanation of provision.*— * * *

The treatment provided here can be illustrated by an example. Assume that in 1965 a $100 liability is asserted against a business which it pays at that time but contests the liability in a court action. Assume further that in 1967 the court action is settled for $80. Under present law, before the enactment of this provision, the deduction of $80 would be allowed in 1967. Under your committee's action, the taxpayer could claim a $100 deduction in 1965 but then in 1967 would have to take $20 into income * * *. [Emphasis supplied. Footnotes omitted.]

collector to cover certain proposed liabilities in a revenue agent's report for the fiscal years 1943–49 while its tax liability for the fiscal year 1942 was being litigated and before any deficiency had been determined or assessment made for the years 1943–49. After the liability for 1942 had been determined it was also determined that the taxpayer did not owe the full amounts voluntarily remitted for 1943–49 and a part of the voluntary remittances was refunded, without interest. Leich then brought an action for interest on the amounts refunded. The court held that the remittances made in 1952 and 1953 were not *overpayments* in respect of any internal revenue tax but rather were mere deposits in the nature of a cash bond and that, therefore, the taxpayer was not entitled to statutory interest on the refunds. The case has no application here. If anything, the case supports the respondent's contention that section 223, *supra*, avoids the result of the decision in *Consolidated Edison*. See that part of the opinion which says: "Taxpayer is correct in stating that this section [223] was meant to, and does, avoid the result of the decision of the Supreme Court in United States v. Consolidated Edison Co., 366 U.S. 380 * * *."

In the instant case, the items being contested (the excise taxes) had actually been paid by petitioner to the watch companies as a part of the goods purchased, and deductions therefor had been taken in the years 1954, 1955, and 1956, and it may be added that petitioner admits it derived a tax benefit from the deductions taken in the prior years. Absent *Consolidated Edison*, it is clear that the deductions taken in the prior years were properly taken, *Chestnut Securities Co.* v. *United States*, 62 F. Supp. 574 (Ct. Cl. 1945), and that the refunds received in 1958 and 1959 were taxable income to petitioner in those years. *Freihofer Baking Co.* v. *Commissioner*, 151 F. 2d 383 (C.A. 3, 1945), affirming a Memorandum Opinion of this Court.

We hold for the respondent on the first issue.

Regarding the second issue, it is our opinion that the respondent's determination must also be sustained. Although petitioner consistently kept its books and prepared its returns on an accrual method of accounting, it nevertheless, prior to 1958, followed the practice of deducting vacation pay to its union and nonunion employees in the years in which the vacation payments were made. For the taxable years 1958 and 1959, because of its agreement with the union, entered into on October 1, 1958, petitioner seeks to accrue and deduct for 1958 and 1959 the amounts of $7,393.80 and $2,467.33, respectively, of vacation pay in excess of the amounts actually paid during those years. These amounts represent the cost of vacations which petitioner *believed* would be taken by union employees in the following year under the terms of the 1958 contract with the union, and by nonunion employees. Under an accrual method of accounting, the deduction of an

item depends upon whether all the events have occurred which determine the liability of the taxpayer to pay it; a liability does not accrue as long as it remains contingent. *United States* v. *Anderson*, 269 U.S. 422; *Brown* v. *Helvering*, 291 U.S. 193; and *Denver & Rio Grande Western Railroad Co.*, 38 T.C. 557, 572.

On December 31, 1958, and on December 31, 1959, petitioner could not have established its liability to its union employees nor could it have computed its liability to these employees with reasonable accuracy because, under the terms of section 3 of article VI of its contract with the union, only those employees who had worked 1,800 hours exclusive of overtime "in the year preceding May 1st of the year in which the vacation is scheduled" were entitled to vacation pay. Section 1 of article IV of the contract provided that the regular work schedule shall be 40 hours per week, 8 hours per day, 5 days per week from Monday to Friday, inclusive. Therefore, 1,800 hours would be 45 weeks. By the application of simple arithmetic, it is apparent that no union employee could have worked more than approximately 35 weeks or 1,400 hours, exclusive of overtime from May 1 to December 31 of 1958 and 1959, respectively. We think it follows that on December 31, 1958 and 1959, the liability for vacation pay was still *contingent* on completing the 1,800 hours of service and *all the events* had not yet occurred which would determine petitioner's liability to pay the amounts of $7,393.80 and $2,467.33, respectively. Furthermore, it well may be that in order to obtain vacation with pay in 1959 and 1960 the employee be employed on May 1, 1959, and May 1, 1960, respectively. This event would also be contingent on December 31, 1958, and December 31, 1959, respectively.

The instant case is very similar to *E. H. Sheldon & Co.*, 19 T.C. 481, affirmed on this issue 214 F. 2d 655 (C.A. 6, 1954). In that case the taxpayer kept its books and reported on an accrual, calendar year basis. In May 1945 it entered into a contract with a labor union providing in part that vacation pay was to be determined and computed on May 1 of each contract year and that the vacation period shall be from May 1 to December 1 of each year. The taxpayer sought to accrue and deduct in 1945 an amount estimated on December 31, 1945, to be two-thirds of its vacation pay obligation payable in 1946. In sustaining the Commissioner's disallowance of this deduction, we said in part:

No employee was entitled to vacation pay under the agreement unless he was an employee at the beginning of the contract year and had been an employee for at least 1 year prior thereto. * * *

It was not known in 1945 whether or not the contract then in effect would remain in effect after April 30, 1946, but if it did, nevertheless the mere employment of a man during the period May 1, 1945, through December 31, 1945, did not entitle him to vacation pay for 1946. If he thereafter separated from the petitioner for any reason he would fail to qualify on May 1, 1946, for vacation pay for the employment period beginning on that day. * * *

Respondent's position is further strengthened by the fact that a part of the vacation pay deduction taken is attributable to petitioner's *nonunion* employees. Petitioner has failed to adduce any evidence that these employees could have qualified for vacation pay on December 31, 1958 and 1959, for the respective subsequent years.

We hold for the respondent on the second issue. In view of this holding it becomes unnecessary to consider respondent's final contention that petitioner neither requested nor obtained the consent of the Service to change its method of accounting of vacation pay from the cash to the accrual basis adopted in 1958, which respondent contends is in disregard of the provisions of section 446(e) of the Internal Revenue Code of 1954 and the regulations issued thereunder. Cf. *Dorr-Oliver Inc.*, 40 T.C. 50.

Because of the fact that the tax attributable to the refund of interest (first issue) has been assessed, the respondent suggests it may be necessary for the decision in this proceeding to be rendered under Rule 50. Therefore,

*Decision will be entered under Rule 50.*