353 F.2d 429
 Alfred FORTUGNO, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Silvia FORTUGNO, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Adeline FORTUGNO, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Anthony FORTUGNO and Mollie Fortugno, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Anthony FORTUGNO, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Connie M. Fortugno RUBLE, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Anne Fortugno CAMP, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Arthur FORTUGNO, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 Nos. 15210-15217.
 United States Court of Appeals Third Circuit.
 Argued June 8, 1965.
 Decided November 19, 1965.
 
 Harold Kamens, Newark, N. J., for petitioners, Alfred Fortugno, Silvia Fortugno, Adeline Fortugno, Anthony and Mollie Fortugno, Anthony Fortugno, Connie Fortugno Ruble and Anne Fortugno Camp (William Ancier, Newark, N. J., on the brief).
 Herbert R. Berk, New York City, for petitioner Arthur Fortugno (Weisman, Allan, Spett & Sheinberg, New York City, on the brief), Richard Osserman, New York City, of counsel.
 William A. Friedlander, Washington, D. C., for respondent in all cases (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, I. Henry Kutz, Attys., Dept. of Justice, Washington, D. C., on the brief).
 Before BIGGS, Chief Judge, and HASTIE and SMITH, Circuit Judges.
 BIGGS, Chief Judge.
 
 
 1
 The taxpayer-petitioners[1] seek review of decisions of the Tax Court of the United States which held that certain portions of monies remitted by them to the United States were not "overpayments" within the meaning of Section 3771(a) of the Internal Revenue Code of 1939, 26 U.S.C.A., and that therefore the petitioners were not entitled to interest on the portions of the sums remitted, as hereinafter indicated.[2]
 
 
 2
 In 1950 the United States Internal Revenue Service commenced an investigation of the income tax liability of the taxpayers and of the ownership of a fertilizer distribution business operated under the name of Hudson Manure Company. During the course of the investigation, certain aspects of the ownership of Hudson Manure Company were before New Jersey State tribunals for determination and it was adjudicated by the Appellate Division of the Supreme Court of New Jersey that the taxpayers from 1934 to 1950 were co-partners under the name of Hudson Manure Company. Fortugno v. Hudson Manure Co., 51 N.J. Super. 482, 144 A.2d 207 (1958).
 
 
 3
 The taxpayers failed to file income tax returns for the taxable years 1934 to 1939, inclusive, with the exception of Connie M. Fortugno Ruble, who had filed a tax return for the taxable year 1939. All the taxpayers filed income tax returns for the taxable years 1940 to 1950, inclusive.
 
 
 4
 On July 1, 1954, Anthony Fortugno was convicted of income tax evasion for filing false individual returns and a false income tax return for the partnership.
 
 
 5
 Early in July 1954, the Internal Revenue Service audited the records of the partnership and informed counsel for the Fortugnos that they stood in danger of jeopardy assessments and possible criminal proceedings. The Fortugnos' counsel told them that to avoid such assessments they would have to remit approximately $750,000 to the United States. The Fortugnos authorized their counsel to make a counter offer of $400,000 but this was rejected. During July and August of 1954 negotiations were carried on between representatives of the Internal Revenue Service and the Fortugnos as to the amount to be remitted to the United States and as a result of these negotiations it was determined that the Fortugnos should remit $1,000,000. On August 31, 1954 a letter of transmittal, addressed to the District Director of the Internal Revenue Service, Newark, New Jersey, was prepared by the Internal Revenue Service and was signed by the eight taxpayers in which they stated that they were sending their respective checks for $125,000 to the District Director. The letter recited that the $1,000,000 was to be credited against the aggregate of any tax assessments made against the taxpayers. If there were any excesses in the remittances these excesses should be remitted to the taxpayers. The letter further stated that the submission of the remittances should not prejudice the right of the taxpayers to contest the validity of any assessments but that the remittances would stop the running of the interest on the amount remitted, viz., $1,000,000, as of the date of the remittances.[3]
 
 
 6
 It will be observed that references were made in the letter of submission to an agreement which was being prepared in respect to assessments. This proposed agreement was never executed.
 
 
 7
 When the remittances of $125,000 were sent by each taxpayer to the United States the taxpayers requested and received a receipt for the remittances. This was stamped at its top and at its bottom as follows, "Receipt for Payment of Taxes."[4]
 
 
 8
 It is conceded that during some of the meetings between the representatives of the Internal Revenue Service and the taxpayers and their attorneys questions of interest were discussed. The taxpayers testified that Leo Asher, representing the United States, advised them that if there were overpayments they would receive interest on them. Asher, who was in the court room at the time of the trial before the Tax Court, was not called by the United States but another representative of the Internal Revenue Service who was present, did testify. He stated that he had no recollection of whether the taxpayers were advised that interest would be paid on any excess or excesses. He remembered only advising the taxpayers that the remittances, if made, would stop the running of interest on the amount of $1,000,000, should the claims of the United States amount to that sum or to a lesser sum.
 
 
 9
 The Tax Court found on ample evidence that as of August 31, 1954, the petitioners individually had no knowledge as to the amounts of their separate income tax liabilities. The Commissioner did not issue 30-day letters to the petitioners until June 14, 1955, and notices of deficiencies were not issued until May 6 and May 7, 1957. In these deficiency notices the United States set out estimated sums totalling $1,900,000 as allegedly due and owing from the taxpayers. These estimates seemingly were based upon the view then taken by the Internal Revenue Service that Hudson Manure Company was owned solely by Anthony Fortugno. After the Superior Court of New Jersey handed down its decision in Fortugno v. Hudson Manure Company, supra, determining that the fertilizer business was owned by an eight-way partnership comprised of the taxpayers, the Internal Revenue Service greatly reduced its asserted claims and it appears from the record that the United States and the taxpayers finally agreed that the aggregate deficiencies of the taxpayers was an amount slightly in excess of $100,000. The agreement referred to is set out in the preliminary statement of facts in the opinion of the Tax Court.[5]
 
 
 10
 It is clear that in 1954 there were no assessments of income taxes outstanding against any of the petitioners to which the $1,000,000 could be applied, and that for a long period after the remittances were made and until the stipulation of liability was agreed to in the Tax Court, the petitioners continued to deny liability for income taxes. It is clear also that the taxpayers remitted amounts very substantially in excess of their respective tax liabilities to the United States. The taxpayers' claims for statutory interest on these excesses are the subject matter of the present litigations.
 
 
 11
 Whether or not the taxpayers are entitled to statutory interest pursuant to Section 3771(a) of the Internal Revenue Code of 1939, 26 U.S.C.A., depends on whether or not the sums remitted constituted an "overpayment in respect to any internal revenue tax * * *." The key word is "overpayment." In order to have an overpayment there must, of course, have been a payment. The question as to what constitutes "payment" of a tax within the Internal Revenue Code has been the subject of extensive litigation but the courts when confronted with this issue have failed to reach uniform results under what can be deemed to be substantially similar facts.[6] It does not appear that Congress clarified the law with respect to what constitutes a "payment" by adding subsection (c) to Section 3770 of the 1939 Code, 26 U.S.C.A. This provides: "(c) Rule where no tax liability. An amount paid as tax shall not be considered not to constitute an overpayment solely by reason of the fact that there was no tax liability in respect of which such amount was paid." The use of a double negative seems not to be of assistance in clarifying the congressional intent.
 
 
 12
 The legislative history of the statute does not greatly aid us.[7] Moreover, the courts have not given uniform interpretation to the subsection.[8] The factual situation which gives rise to the problem is usually a simple one. The taxpayer learns of possible tax liability and places in the hands of the Collector of Internal Revenue an amount of money deemed by him to be sufficient to stop the running of interest or penalty assessments. It transpires that the amount remitted was more than the tax due. The question then arises as to whether such a remittance is a payment of tax or a mere deposit to avoid the running of interest or assessment of penalties. There are, of course, widely differing circumstances which attend such remittances made by taxpayers. The ultimate issue, however, is one of law and must be viewed as such.
 
 
 13
 The taxpayers contend that the numerous cases cited by the Commissioner are inapposite to the solution of the problem at bar, pointing out that they deal with the following established propositions: that (1) the taxpayer can deduct interest for the taxable year in which payment was made; United States v. Consolidated Edison Co. of N. Y., Inc., 366 U.S. 380, 81 S.Ct. 1326, 6 L.Ed.2d 356, (1960); that (2) a payment made by the taxpayer may turn out to be an overpayment and the statute of limitations commences to run on an overpayment at the time it is made; Rosenman v. United States, 323 U.S. 658, 65 S.Ct. 536, 89 L.Ed. 535 (1945); that (3) when an overpayment is made, the date of the overpayment determines the time when interest accrues; Busser v. United States, 130 F.2d 537 (3 Cir. 1942); and that (4) payment of a tax stops the running of any interest and the assessment of any penalty. In respect to (4), it is clear that the stopping of the running of interest and penalties can eventuate not only by the payment of the tax, but by a deposit of money in the nature of a surety bond for payment of tax thereafter to be found due. Rosenman v. United States, supra. The petitioners argue that the events (1), (2), (3) and (4) as stated above are independent occasions which do not control and are not relevant under the circumstances at bar. They contend that (3) and (4) occur simultaneously except in "dumping" cases. It is clear, however, that when payment is made the taxpayer can avail himself of (1); that if (2) is applicable and the payment made by the taxpayer turns out to be an overpayment, the statute of limitations begins to run in favor of the United States; (3) that if there be an overpayment by the taxpayer, the date of the payment determines the time when interest accrues; and finally, (4) the payment of the tax stops the running of any interest or the assessment of any penalty. Thus it will be observed that the decisions are not discordant and have relevancy to our present problem. This is the logic expressed in the Rosenman case where Mr. Justice Frankfurter stated: "If it is not payment in order to relieve the Government from paying interest on a subsequently determined excess, it cannot be payment to bar suit by the taxpayer for its illegal retention. It will not do to treat the same transaction as payment and not as payment, whichever favors the Government." Id., 323 U.S. at 663, 65 S.Ct. at 538.
 
 
 14
 One line of decisions holds that a tax is not paid until it is assessed whether or not it be paid pursuant to a waiver consenting to assessment. Thomas v. Mercantile Nat. Bank, 204 F.2d 943 (5 Cir. 1953); United States v. Dubuque Packing Co., 233 F.2d 453 (8 Cir. 1956). Other authorities hold that payment occurs when there is a "defined" tax liability whether or not there has been an assessment. Plankington v. United States, 267 F.2d 278 (7 Cir. 1959). A third line holds that payment means the satisfaction of an asserted tax liability, and that an effective satisfaction depends on the agreement of the taxpayer and the Government that a tax liability is being discharged. Lewyt Corp. v. Commissioner, 215 F.2d 518 (2 Cir. 1954); Rose v. United States, 256 F.2d 223 (3 Cir. 1958).
 
 
 15
 The three approaches are all logically related to the Rosenman case. Rosenman does not foreclose treating as a tax payment a remittance made prior to assessment. Nor did the Tax Court foreclose treating the instant remittances as tax payments merely because assessments had not been made. The Tax Court adopted the view taken by what we believe to be the weight of authority that there must either be an assessment or an acquiescence in the proposed deficiency. In the cases at bar there was neither. The Tax Court in effect adopted the Lewyt "satisfaction" approach for it held that the taxpayers were unable to show that the 1954 remittances were made with the intention of satisfying an asserted tax liability.
 
 
 16
 The petitioners advance several arguments to show that the Tax Court erred in so holding. First, they contend that the only instance in which a remittance by a taxpayer may not be treated as a payment is where the sum is remitted without regard to an orderly, apparent or reasonably possible ultimate tax liability and for the purpose of taking advantage of the high interest rate on overpayments. This is the rationale of the so-called "dumping" cases. The taxpayers assert that this was the logic of our decision in Busser v. United States, supra, and that the reason behind the enactment of Section 3770(c) was to limit Busser and similar decisions to denials of interest only in "dumping" situations.[9] See note 7, supra. But in Murphy v. United States, 78 F.Supp. 236, 240 (S.D.Cal.1948), the court deemed subsection (c) of Section 3770 to be applicable in aid of the taxpayer only to situations where the taxpayer in good faith has overpaid his taxes in his tax return or where the Commissioner has made an erroneous assessment. Perhaps the application of the subsection by the court in the Murphy case is too narrow a one but we think not. Compare Charles Leich & Company v. United States, 329 F.2d 649 (Ct.Cl.1964).
 
 
 17
 The taxpayers rely on a line of cases decided by the Court of Claims which have allowed interest on facts somewhat analogous to those in the instant case. Atlantic Oil Producing Co. v. United States, 35 F.Supp. 766, 92 Ct.Cl. 441 (1940); Hanley v. United States, 63 F. Supp. 73, 105 Ct.Cl. 638 (1945); Reading Co. v. United States, 98 F.Supp. 598, 120 Ct.Cl. 223 (1951). However, in Charles Leich & Company v. United States, supra, the Court of Claims itself distinguishes these cases by pointing out that there were no factors present to negate payment, and held "that the factors of `contest,' coupled with the fact of no assessment, is sufficient to negate `payment.'" Id. 329 F.2d at 653.
 
 
 18
 In the cases at bar the petitioners contested their tax liabilities from the very day of their remittances. Here, as was stated in Lewyt Corp. v. Commissioner, supra, "The taxpayer was not entitled to have these remittances treated as a satisfaction of its tax liabilities in whole or in part, and at the same time continue to contest such liabilities. * * * Here the taxpayer was tendering its check with one hand, and contesting its liability to pay with the other." Id. 215 F.2d at 522-523. Cf. Richardson v. Smith, 196 F.Supp. 432 (E.D.Pa. 1961), aff'd per curiam, 301 F.2d 305 (3 Cir. 1962).
 
 
 19
 The taxpayers also place reliance upon the decision of the Second Circuit in Colt's Manufacturing Co. v. Commissioner, 306 F.2d 929 (2 Cir. 1962), as supporting their view as to the impact of Section 3770(c). In that case the Internal Revenue Service, after an audit, sent the taxpayer a notice of deficiency and, before the asserted tax liability had been assessed, the taxpayer paid it in full. The assessment of the tax liability occurred over a year later. The taxpayer had contested this asserted tax liability from the beginning. When the court found that no deficiency existed, the Commissioner contended that payment did not occur until assessment, citing the Rosenman case for authority. The taxpayer argued that the effect of Rosenman was nullified by Section 3770 (c). The Court of Appeals for the Second Circuit held that payment occurred at the time of remittance rather than at assessment, but did not accept the taxpayer's argument. Since we do not hold that payment can occur only after assessment, the Colt decision is not in conflict with our decision in the instant cases and we deem it unnecessary to discuss the Colt decision further except to say it would appear that the court in that case concluded that the remittance of the full amount of the asserted tax liability after a notice of deficiency was the determining factor which brought the taxpayer within the purview of Section 3770(c). We point out that in the cases at bar these factors are not present.
 
 
 20
 We have considered the other arguments advanced by the taxpayer-petitioners but deem it unnecessary to discuss them.
 
 
 21
 The decisions of the Tax Court will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 The taxpayer-petitioners are eight members of the Fortugno family. Eight petitions for review are involved, at our numbers 15210 to 15217, inclusive. The issues raised by each of the eight petitions are identical
 
 
 [2]
 The decision of the Tax Court is reported at 41 T.C. 316 (1963)
 
 
 [3]
 The letter reads as follows:
 "August 31, 1954
"District Director of Internal Revenue
Newark, New Jersey
 "Attached hereto are eight (8) checks drawn to the order of the District Director of Internal Revenue and dated August 31, 1954. These checks are more specifically identified as follows:
 "Name of Maker "Bank "Amount
 Daniel Fortugno Hudson County National $125,000.00
 Silvia Fortugno " " " 125,000.00
 Anthony Fortugno " " " 125,000.00
 Alfred Fortugno " " " 125,000.00
 Arthur Fortugno " " " 125,000.00
 Adeline Fortugno " " " 125,000.00
 Anne (Fortugno) Camp " " " 125,000.00
 Connie (Fortugno) Ruble " " " 125,000.00
 "Your attention is directed to the fact that the Internal Revenue Service is now auditing the tax returns of the individuals enumerated above for years 1934 through 1950 inclusive and in anticipation of tax assessments which include penalties and interest being made, we desire to submit the attached checks amounting to one million dollars, ($1,000,000.) to be credited to our tax assessments when same are finally made. It is our understanding that the payment of one million dollars ($1,000,000.) submitted herewith will stop the running of interest on that amount from this date of payment.
 "It is further understood and agreed that the payment of one million dollars ($1,000,000.), referred to above, will be applied against any unpaid liabilities of all of the above-mentioned taxpayers, or against any of them as the final determination of tax liability is made. In the event that the respective checks submitted herewith of each taxpayer toward the above-mentioned sum of one million dollars ($1,000,000.), should exceed the amount of the assessments made against such individual taxpayer, the excess of such check submitted by said taxpayer will be applied toward the payment of the tax liability of any or all of the other remaining taxpayers. Under no circumstances shall any part of the amount of the one million dollars, ($1,000,000.), payment made herewith be returned to the respective taxpayers if the total amount of said payment is insufficient to satisfy the tax assessments of any or all of the taxpayers mentioned herein. In the event that the aforementioned payment of one million dollars, ($1,000,000.), should exceed the tax liability, when finally determined, of the taxpayers mentioned herein, then such excess over the amount required to satisfy the unpaid tax liability shall be returned to the respective taxpayers.
 "We also desire to direct your attention to the fact that an agreement is now being prepared in connection with the above-mentioned assessments and the terms of said agreement will be binding upon us and the government when said agreement is properly executed.
 "We expressly call attention to the fact that the within payment of one million dollars, ($1,000,000.), shall not in any way prejudice the rights of any or all of us to contest the validity of said assessments or to take any other action which we may desire relative to said assessments.
 S/ DANIEL FORTUGNO S/ SILVIA FORTUGNO
S/ ANTHONY FORTUGNO S/ ARTHUR FORTUGNO
S/ ADELINE FORTUGNO S/ ANNE (FORTUGNO) CAMP
S/ CONNIE (FORTUGNO) RUBLE
 "August 31, 1954
 "Receipt is acknowledged of all of the above checks with the exception of the check of Alfred Fortugno who is in the U. S. Army. His check will be delivered on or about September 8, 1954.
 "S/ LEO ASCHER
 Internal Revenue Agent
 "Received original and duplicate of above letter on August 31, 1954.
 "S/ LEO ASCHER
 Internal Revenue Agent"
 
 
 [4]
 Judge Fay's findings of fact in the Tax Court in respect to the treatment by the Commissioner of the remittances of the taxpayers are as follows:
 "(a) Upon receipt of the seven $125,000 checks on August 31, 1954, the cashier's branch of the collection division of the Internal Revenue Service prepared a document entitled `Unclassified Account Voucher' — `Serial No.' This Unclassified Account Voucher contains a block number of 914271. The digit `9' in the block number indicates an unclassified or unidentified account and was used since there was no open account or open assessment against any of the seven petitioners whose checks had been received. The journal entry on August 31, 1954, for the receipt of the checks was a debit to cash and a credit to `Unidentified collections.' The remittance of $875,000 went into the revenue receipts of the U.S. Treasury Department. The check received from Alfred Fortugno on September 7, 1954, was accorded similar treatment.
 "(b) On November 1, 1954, the foregoing $1 million was transferred from revenue receipts to deposit fund in accordance with changes in Internal Revenue Service accounting procedures. On May 12, 1955, the foregoing $1 million was transferred from deposit fund to revenue receipts in accordance with changes in Internal Revenue Service accounting procedures.
 "(c) On May 12, 1955, the foregoing $1 million was transferred from the account entitled `Unidentified collections' to the account entitled `Unassessed revenue collected — advance payments — individual income, other.'
 "The Internal Revenue Service also maintains a form designated Certificate of Assessment and Payments, Form 899, and on each Form 899 for each of the petitioners the following notation appears: `Advance Payment: Received 8/31/54 in Unidentified $125,000.00 — Transferred to Advance Payment 5/12/55.'"
 See 41 T.C. 320-321.
 
 
 [5]
 The Tax court stated as follows: "The parties have disposed of all issues regarding the deficiencies and penalties and are in agreement that the petitioners have paid an amount in excess of their tax liabilities."
 
 
 [6]
 Compare Atlantic Oil Producing Co. v. United States, 35 F.Supp. 766, 92 Ct.Cl. 441 (1940) with Busser v. United States, 130 F.2d 537 (3 Cir. 1942). These cases were decided before subsection (c) was added to Section 3770 of the 1939 Code
 
 
 [7]
 There were hearings held by the Finance Committee of the Senate in 1943 in relation to the Current Tax Payment Act of which Sections 3770 and 3771 are parts. Senate Report No. 221, 78 Cong., 1st Session (1943 Cum.Bull. 1314, 1339-40) states as follows: "Section 4(d) of the bill adds new subsection (c) to section 3770 of the Code. Under this provision an amount paid as tax shall not be considered not to constitute an overpayment solely because there was no tax liability in respect of which that amount was paid
 "The income-tax law requires the taxpayer to make a return of his tax and to pay the tax so returned. These requirements contemplate that in the discharge of these duties at the time, place, and manner prescribed honest mistakes will occur — mistakes both as to the amount of the tax and as to the existence of any tax liability; and that such honest mistakes, made incident to the bona fide orderly compliance with the actual or reasonably apparent duties of the taxpayer are to be corrected under the provisions of law governing overpayments. In the opinion of your committee, existing law so provides. The language of certain court decisions (holding that certain payments, not made incident to a bona fide and orderly discharge of actual or reasonably apparent duties imposed by law, are not overpayments and accordingly that interest is not payable) has been read by some as meaning that no payment can result in an overpayment if no tax liability actually existed. Your committee does not believe that such reading is in any way a statement of existing law. The provisions of the bill, however, emphasize the need for clarity in this regard.
 "Under the bill as reported by your committee, two requirements become basic features of the income tax: (1) The declaration and payment of the estimated tax; and (2) the withholding and collection by the employer of tax from the wages of employees, and the return and payment as such of the amount by the employer to the Government. Honest mistakes incident to faithful and orderly compliance will, of course, occur, just as they have in the older procedures of the tax. The doubts expressed as to the existence of an overpayment in case it ultimately turns out that there is no tax, your committee believes, should be put to rest, and to this end submits the amendment to section 3770 of the Code. In the view of your committee, the Code does not contemplate that liability for interest can be cast on the Government by merely dumping money as taxes on the collector, by disorderly remittances to him of amounts not computed in pursuance of the actual or reasonably apparent requirements of the Code, or not transmitted in accordance with the procedures set up by the Code, or by other abuses of tax administration. As to these, your committee believes that a proper application of existing law will enable the courts, in the future as generally in the past, to deny treatment as overpayments to these improper payments."
 
 
 [8]
 Compare Reading Co. v. United States, 98 F.Supp. 598, 120 Ct.Cl. 223 (1951) with Murphy v. United States, 78 F.Supp. 236 (S.D.Cal.1948). These cases were decided after subsection (c) was added to Section 3770 of the 1939 Code
 
 
 [9]
 Cf. Moses v. United States, 28 F.Supp. 817 (S.D.N.Y.1939)