Arthur C. EWING, a/k/a A. Clifford Ewing and Maxine H. Ewing, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

Civ. No. ST–C–88–71.

United States District Court, W.D. North Carolina, Statesville Division.

April 19, 1989.

**266**

Steven J. Horowitz, J. Randall Groves, Joyce W. Wheeler, Weinstein & Sturges, Charlotte, N.C., for plaintiffs.

Mark Stier, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., Thomas J. Ashcraft, U.S. Atty., Clifford C. Marshall, Asst. U.S. Atty., Asheville, N.C., for defendant.

## MEMORANDUM OF DECISION

RICHARD L. VOORHEES, District Judge.

THIS MATTER comes before the Court with several motions pending, including cross-motions for summary judgment. As Plaintiffs' motion for summary judgment is to be granted, their motions in limine and to compel will be rendered moot and need not be examined. Defendant's motion for summary judgment will be denied.

This is a tax matter. Plaintiffs, Arthur C. Ewing and Maxine H. Ewing, seek to recover money they remitted to the Internal Revenue Service (IRS) in connection with their tax liabilities for the years 1976–79, inclusive. Various remittances were made in connection with an audit examination the IRS made of the Ewings' returns for the years in question. Plaintiffs eventually remitted a total of $333,641.17. Although Plaintiffs make several other arguments, the key issue is whether the monies remitted constitute "deposits" which are subject to refund under appropriate conditions, rather than payments collected for taxes due and owing. This issue is decided in Plaintiffs' favor and is dispositive of the case, so Plaintiffs need not prove any of their other contentions, and this decision need not address them.

## I. APPLICABLE LAW

The starting point for answering the questions posed by this case is *Rosenman*

*et al. v. United States,* 323 U.S. 658, 65 S.Ct. 536, 89 L.Ed. 535 (1945). *Rosenman* dealt with plaintiffs, executors of an estate, who had remitted money to the IRS in connection with an estate tax dispute. They later filed for a refund. The question, as here, was whether the remittance constituted "payment" of a "tax." If so, plaintiffs would have lost, being outside the three-year limit for a tax refund claim. However, the Court ruled that the remittance was merely a "deposit," placed in a special suspense account created only "for depositing money received when no assessment is then outstanding against the taxpayer." *Id.* at 662, 65 S.Ct. at 538. Since the actual assessment of tax due had been made by the IRS less than three years before the taxpayer filed the claim, plaintiffs were within the statute of limitations.

The lower courts, however, are far from being in agreement that *Rosenman* establishes a *per se* rule that any monies remitted before assessment is made are always deposits and can never be payments of taxes. Those who would deny the existence of such a *per se* rule can point to *Rosenman*'s remark that "[o]n December 24, 1934 [the date of the remittance], the taxpayer did not discharge what he deemed a liability nor pay one that was asserted." *Id.* at 662, 65 S.Ct. at 538 (emphasis added). This can be taken as creating an either/or test: the tax is paid either when remittance is made pursuant to an assessment, or when the taxpayer pays what he "deem[s] a liability," that is, what he honestly believes he owes. Herewith, a review of cases that take that view is set forth to see why they rest on weak authority and are based on factual situations which have little to do with the present case.

In *Ford v. United States,* 618 F.2d 357 (5th Cir.1980), the Fifth Circuit criticized its own precedent, *Thomas v. Mercantile National Bank at Dallas,* 204 F.2d 943 (5th Cir.1953), which established the *per se* rule in that circuit, and is still good law there. *Ford* asserted that "nearly every other court considering the question of when tax was 'paid' has adopted a course in conflict with that rule." *Id.* at 360 (citing cases). One case *Ford* cited was *Hill v. United*

*States,* 263 F.2d 885 (3d Cir.1959). *Hill* was an open-and-shut case of a taxpayer who filled out his return wrongly and attempted to file for a refund outside the statute of limitations. "A taxpayer makes out his return form; he accompanies it with a check for the amount he figures he owes. If that is not the sending of money in discharge of the debt it is hard to figure out what a 'payment' can be." *Id.* at 886. *Hill* obviously gave little or no thought to the distinction between a payment and a deposit, as it was so clear that the remittance in that particular case was a payment. *Ford* also cites *Colt's Mfg. Co. v. Commissioner,* 306 F.2d 929 (2d Cir.1962). This was a case where the government was attempting to assert that "no overpayment can exist until the assessment or allocation of the amount to the payment of a tax...." *Id.* at 932. Plaintiff Colt's Mfg. won, but only because "the effect of the *Rosenman* case was nullified by the enactment of Section 3770(c) of the Internal Revenue Code of 1939, 26 U.S.C. (1952 ed.) ...," *Id.* at 932–33. Obviously, this has nothing to do with *Rosenman* as it deals with a situation in which the case law is not applicable, there being an act of Congress that controls. Similarly, *Ford* cites *United States v. Miller,* 315 F.2d 354 (10th Cir.1963). *Miller* dealt with a married couple who had paid "estimated tax" for two years for which they actually owed no tax. Outside the limitations period, they applied to get it back. They lost because, said the court, the Current Tax Payment Act of 1943 specified that such a situation constitutes "payment," notwithstanding that no tax was ever owed. *Id.* at 358. Therefore, *Miller* also is based on statutory, not case law, and does not directly interpret *Rosenman.* Significantly, *Rosenman* itself stated, "([w]e need not here consider the effect of the Current Tax Payment Act of 1943 ...)," *Rosenman, supra,* 323 U.S. at 663, 65 S.Ct. at 538, suggesting that *Rosenman* creates general principles that can be overridden by statute, but which were not so overridden in *Rosenman* itself. Clearly, all three of these cases lend very weak support to the proposition *Ford* claims to stand for.

One case *Ford* cites that is a bit stronger is *Fortugno v. Comm. Int. Rev.,* 353 F.2d 429 (3rd Cir.1965). *Fortugno* makes the twin observations: "*Rosenman* does not foreclose treating as a tax payment a remittance made prior to an assessment," and, "we believe ... the weight of authority [to be] that there must either be an assessment or an acquiescence in the proposed deficiency...." *Id.* at 435. (Emphasis added). This "acquiescence" seems to refer to some sort of formal concession by the taxpayer that he does in fact owe the tendered amount; *e.g.,* the tax return in *Hill, supra.* In the instant case, the formal acquiescence, if any, would seem to have been the Closing Agreements and IRS Forms 1902–B and 4549 that the Ewings signed; but as will be seen, they carry no weight. Thus, *Fortugno* appears to have no applicability to today's case.

One last case that tends to support the government is *Ameel v. United States,* 426 F.2d 1270 (6th Cir.1970). First, it should be noted that the facts of *Ameel* are very different from the instant case: the taxes actually were formally assessed by the IRS after the taxpayer had signed a form agreeing to additional liability; here, they never were. This might well be the "acquiescence" *Fortugno* talks about. But, let us look at the language of *Ameel.* "However, a number of courts construed certain dicta in *Rosenman* to suggest that payment may be effected prior to a formal assessment...." *Ameel, supra,* at 1273 (citation omitted) (emphasis added). This is hardly the strongest language that might be imagined in interpreting *Rosenman* this way.

Clearly the above cases do not impress as being the most coherent or consistent views of *Rosenman.* Now let us examine the cases which go the other way. The earliest one in time is *Thomas v. Mercantile Nat. Bank, supra. Thomas* stands foursquare for a *per se* rule.

The deficiency assessment did not come into existence until the Commissioner certified the assessment list.... Until the Commissioner certified the assessment list ... there was no deficiency

assessment, and no liability on the part of the taxpayer, and consequently nothing to pay. The sum deposited with the Collector ... was merely an advance deposit to cover additional tax liability expected to arise thereafter.

*Id.* at 944. Nothing in *Thomas* even remotely suggests that it is possible to pay tax before it is assessed.

Another early case is *United States v. Dubuque Packing Co.*, 233 F.2d 453 (8th Cir.1956). There, the court said of the district court (the Northern District of Iowa, Graven, J.) from which the appeal was being taken:

It considered that a taxpayer may transfer money to tax collecting authorities for a number of reasons other than the satisfaction of a clearly defined tax liability and that not every transfer of money by a taxpayer to a Federal tax authority will constitute a 'payment' under the laws relating to Internal Revenue. It reasoned that in the case of a proper tax return, the return itself defines the obligation, but where a taxpayer makes a transfer of money to the collector, the transfer itself does not define the tax obligation. Some further act is necessary. Accordingly, it concluded that a money transfer to a Federal tax authority (regardless of the original reason for the transfer) should start the statute of limitations running ... on the date that the tax obligation becomes defined. On this date the transfer becomes a 'payment' because from this day forward the taxpayer has a fair opportunity to determine whether he has a claim for a refund. The Court found its course of reasoning and its conclusion supported by the decision of the Supreme Court in *Rosenman v. United States* ... the reasoning compelled conclusion that the taxpayer's obligation became defined when the Commissioner made assessment.... It is the view of the Court that the transfers of money made by the taxpayer in the instant case did not have the status of 'payment' until the tax deficiencies were formally assessed by the Commissioner.

*Id.* at 459–60, quoting *Dubuque Packing Co. v. United States*, 126 F.Supp. 796, 807 (N.D.Iowa 1954) (emphases added.)

The reasoning of the district court, as summarized, seems quite sound. The *Dubuque Packing* court went on to say:

It is contended for the government against this view that the taxpayer's remittances constituted voluntary payment of the deficiencies. It stresses particularly that the taxpayer 'agreed' to the deficiencies and that it waived the restrictions on assessment and collection of the deficiencies. But the 'agreement' relied on was not an agreement to the obligation of an indebtedness in the ordinary sense. The revenue agent proposed deficiencies and the taxpayer by its 'agreement' merely indicated its willingness that the taxing process go forward to assessment. The taxpayer's right to file claim for refund and bring suit was not lost by the agreement but was fully preserved to the taxpayer....

*Dubuque Packing, supra,* at 460. This reinforces the district court's assertion, in the antecedent case, that "some further act is necessary" beyond the mere remittance of money, such as filling out a tax return (which the district court gave as an example, and as actually happened in *Hill, supra*) or signing a form admitting further liability (as in *Ameel, supra*).

Although the facts of *Dubuque Packing* are not squarely on point with those of the present case, those of a district court case in the Eighth Circuit, which followed *Dubuque Packing*, are *Estate of M. Karl Goetz v. United States*, 286 F.Supp. 128 (W.D.Mo.1968) dealt, just as the present case does, with a taxpayer who had remitted money in response to a notice of deficiency but whom the government did not assess until after the limitations period was over. "It is therefore, our conclusion that the statute of limitations had expired at the time the assessment was made, and that the plaintiffs are entitled to recover the amounts paid to the Internal Revenue Service prior thereto, and that [the plaintiffs'] Motion for Summary Judgment should be and is sustained." *Id.* at 131.

Another case that should be mentioned as supporting Plaintiffs' view here, even though it is cited in Defendant's brief and not Plaintiffs', is *Plankinton v. United States,* 267 F.2d 278 (7th Cir.1959). *Plankinton* held the opposite of the Tenth Circuit's view of estimated tax payments in *Miller, supra.* In *Plankinton,* the Seventh Circuit noted that "generally remittances made prior to the time the taxpayer's liability is defined do not constitute 'payment' of a tax for the purpose of commencing the limitations period on refund claims," and characterized estimated tax as "payments 'on account' of the tax for the taxable year *i.e.* a remittance on a liability not as yet finally defined or determined." *Id.* at 280. Here the court is clearly thinking of payment as being "defined" by some "further act" than mere remittance, as stated in *Dubuque Packing.* The Seventh Circuit can thus be counted, along with the Fifth and Eighth Circuits, as standing for the stricter interpretation of *Rosenman.*

It should be noted that these cases are nonetheless persuasive for being old. Indeed, it often happens that those closer in time to the enactment of a statute or the handing down of a precedent know best what it really stands for. Frequently changes in social and political beliefs cause later courts to put glosses on statutes and precedents which do not really belong there. Regarding the present issue, it is worth observing that no case located anywhere near in time to *Rosenman* hints at the liberalized standard for "payment" that the government urges today; it did not begin to emerge, in cases which were not squarely on point, until the 1960's, and not until 1980, in *Ford,* do we find it baldly stated that "an examination of taxpayer intent [that is, intent expressed other than by a written agreement] has been an important factor in determining whether a remittance is 'payment' of tax." *Ford, supra,* at 360. But note, as analyzed *supra, Ford* misstates the holdings of prior cases. And note that *Ford*'s statement of the applicable standard is merely *dicta* and not even precedent in the Fifth Circuit, inasmuch as *Mercantile National Bank* is still the law there.

A head-count of the Circuits which have weighed in, then, gives the following tally: The Fifth, Seventh, and Eighth with solid precedents in favor of a strict interpretation of *Rosenman.* The Second, Third, Sixth, and Tenth with cases of varying degrees of strength and relevance, suggesting a looser standard. And a later panel of the Fifth urging a loose standard in *dicta* and unsuccessfully urging that that Circuit meet *en banc* to reverse its earlier holding.

## II. ANALYSIS

Perhaps with so many conflicting views available, it would be wise to go back to the source and see what *Rosenman* actually says. It notes that "[c]laims for tax refunds must conform strictly to the requirements of Congress." *Rosenman, supra,* 323 U.S. at 661, 65 S.Ct. at 537. It then notes that according to the then-current tax law, there was a three-year statute of limitations for taxes "alleged to have been erroneously or illegally assessed or collected." *Id.* This requirement is "couched in ordinary English, and, since no extraneous relevant aids to construction have been called to our attention, Congress has evidently meant what these words ordinarily convey." *Id.* The language of the modern statute is similar, and the same common-sense standard should apply. Everyone agrees that taxes are "assessed" by an independent process conducted by the IRS itself. The dispute then is over when a tax is "collected," and this is to be determined by the ordinary English meaning of the word.

It may even be correct to say that *Rosenman* stands for the proposition that no tax can ever be collected before formally assessed, except when accompanied by a return; as will be seen shortly, there is an interpretation of the language consistent with that. Nonetheless, let us assume *arguendo* that it is possible to have a collection before assessment, even in a case where assessment is formally required. It cannot be the case that any remittance of money at all constitutes collection, for the taxpayer won in *Rosenman.* Now we get

to the language the loose interpretations are based on. "[T]he taxpayer did not discharge what he deemed a liability nor pay one that was asserted." *Id.* at 662, 65 S.Ct. at 538. Can this be taken to mean that any time a taxpayer remits money, he is "deeming" it to be due to a "liability," unless he does it kicking and screaming ("This payment is made under protest and duress, and solely for the purpose of avoiding penalties and interest, since it is contended by the executors that not all of this sum is legally or lawfully due," *id.* at 660, 65 S.Ct. at 537)? It would seem that some courts urge this interpretation. *See, e.g., Ford v. United States, supra;* "[The] *per se* rule, however, contradicts a concept basic to our taxing system, the concept of voluntariness. Ideally our taxing system is a voluntary one, dependent for compliance in large part upon a sense of civic duty. The system has been described as one of 'self-assessment'." *Ford* at 360.

It should be borne in mind that *Rosenman* was written by the great Supreme Court Justice Felix Frankfurter. If he had meant to draw a distinction between those who remit money under protest, taking care to specify they do not really believe they owe it all, and those who fail to say so out loud, he would have found the words to say so more clearly. He would not have let such an important distinction lie in the single phrase, "what he deemed a liability," without further explication. The logical explanation for why that phrase was there is that Justice Frankfurter was acknowledging, in passing, that the taxpayer in the particular case had paid under protest, without attaching any significance to that fact for future cases. This is borne out by the fact that shortly thereafter he says, "[t]he tax obligation did not become defined until April 1938," *id.* 323 U.S. at 662, 65 S.Ct. at 538 (emphasis added); that is to say, not until the assessment was made. The key here is that something, other than the mere remittance of money, must happen to define the amount of the obligation. That could be an official assessment by the IRS, or a tax return or other official document signed by the taxpayer which acknowledges the amount of the obligation.

It cannot be a mere check, the amount of which is based on a rough estimate by either the taxpayer or someone in the government as to how much the taxpayer might owe. (There is always an estimate by someone; amounts on checks are not filled in at random). If that were the case, all remittances would constitute payments, and the distinction between payments and deposits would not exist.

■ As the Fourth Circuit has not addressed the question presented by the instant case, this Court must do so utilizing the best authorities available, but particularly relying on *Rosenman*, that being the last word of the Supreme Court. The Court believes the correct standard for "defining" the amount of a tax obligation consists of: (1) a tax return or the equivalent filled out by the taxpayer when he is remitting at his own initiative; or (2) either an assessment made by the IRS, or a written acknowledgment by the taxpayer of the amount owed, when proceedings are initiated by the government; that is, by government agents informing the taxpayer that they believe he owes additional taxes. Of course, whether the initial payment is based on the taxpayer's own calculations on his return, or the government's calculation upon assessment, it is still possible for the taxpayer to claim a refund within the statutory period if he believes the initial payment to have been wrong; to that extent, it is not final. But the point is that until one of these calculations has been made, there is no tax "payment" in the first place.

The fallaciousness of the loose interpretation of *Rosenman* can be seen by examining how unrealistic the assumptions underpinning it are. *Ford* talks about "voluntariness" and its necessity to the functioning of the system. This is quite true. The vast majority of taxpayers fill out their forms themselves, remit payment, and are never questioned by the IRS. But cases such as the present one, and even *Ford* itself, are different in the extreme. Typically they begin with the IRS sending the taxpayer a deficiency notice. "On April 3, 1974, the Internal Revenue Service sent the

Fords a statutory notice of deficiency informing them that, according to Service calculations, they had underpaid income taxes of 1970 and 1971 ... the Fords remitted to the IRS $8,441.24." *Ford* at 358. It is utterly naive to equate the "voluntariness" of such payments with those of a taxpayer who has just sent in a check with his form 1040.

It is well known among tax attorneys that to make inquiry of the IRS concerning a deficiency notice frequently results in a refusal to explain how the deficiency was calculated and can bring thinly veiled threats that failure to remit promptly will result in interest, penalties, or even criminal prosecution. It would not be something to be wondered at if many taxpayers sent in checks pursuant to deficiency notices without having the slightest idea whether they owed the amount remitted, let alone "acquiesced" in it. Under those conditions, ignorance cannot be equated with acquiescence. In view of all this, something more than the mere remittance of money must be required before a taxpayer can be said to have "voluntarily" paid, or "acquiesced" in the amount of his obligation, or that the amount of indebtedness has been "defined;" to say that money paid under duress in regard to an arbitrarily named figure, to escape worse consequences, constitutes "collection" of an obligation fairly "defined," does violence to the plain English meanings of the words "collection" and "define." Justice Frankfurter would not have approved.

## III. APPLICATION TO THE FACTS OF THIS CASE

■ Most of the relevant facts are undisputed. The Ewings signed consent forms extending the time in which the IRS would assess additional tax. During the extension period, the IRS tentatively calculated their additional liability. They signed Closing Agreements and Forms 1902–B and 4549, effectively conceding the amount of their additional liability, subject to later assessment and collection by the IRS. Treasury Regulations Section 301.7121–1(d)(2) ties closing agreements in to later assessments. The limitations period passed without the IRS having assessed their liability.

Very likely the Forms 1902–B and 4549 would have served as written acquiescence in the amount of obligation, as described in the analysis *supra*, had the government followed through on its duty to make an official assessment. Since the government did not, they are now void. This duty was in the nature of a condition subsequent to a contract. The Ewings, as contracting parties, were entitled to the protection of having the IRS review their case more closely and make sure that the amounts listed on the forms as being the Ewings' additional obligations were not excessive. This was a material part of the contract. Since the government did not live up to it, it cannot now seek to enforce those amounts against the Ewings. Imagine if it were otherwise: The government would never have the slightest incentive to perform the assessment and, like as not, find out that its previous estimate of the additional tax was excessive. It must also be the case that the government must perform the assessment within the applicable limitations period, or not at all. A statute of limitations which does not cut off rights limits nothing.

All the other undisputed facts bring the Ewings squarely into the camp of taxpayers who are entitled to a refund, as per the analysis in Section II, *supra*. Their motion for summary judgment is granted.

■ One additional matter remains to be discussed. Plaintiffs asked for interest on the amount sought to be refunded, on a common-law theory of unjust enrichment. Given that they could cite no case for this proposition, and that it is likely such common-law remedies were preempted by Congress' abolition of statutory interest in such circumstances, this will be denied.

## IV. CONCLUSION

It may seem harsh that the government is being deprived of every penny of the amount by which the Ewings underpaid their taxes, which almost certainly was more than zero. But the IRS itself is no stranger to the use of what might be called "technicalities" where taxpayers fall beyond a time limit, even innocently. Its

harsh three-year statute of limitations for refunds may cut off a taxpayer's rights before he becomes aware that he has overpaid. The government cited in its own brief *U.S. v. Miller*, 315 F.2d 354 (10th Cir.1963), which states at page 359: "The alleviation of hardship resulting from the application of a statute of limitations is a matter of policy for Congress—not for the courts."

A Judgment reflecting the findings herein will be entered simultaneously herewith.

### JUDGMENT

For the reasons stated in the Memorandum of Opinion filed contemporaneously herewith,

IT IS ORDERED, ADJUDGED AND DECREED that the Plaintiffs' Motion for Summary Judgment is ALLOWED and they have and recover of the Defendant, The United States of America, the sum of THREE HUNDRED THIRTY–THREE THOUSAND, SIX HUNDRED FORTY–ONE DOLLARS AND SEVENTEEN CENTS ($333,641.17).

IT IS FURTHER ORDERED that the Defendant's Motion for Summary Judgment is DENIED; and

IT IS FURTHER ORDERED that Plaintiffs' Motion in Limine and to Compel is MOOT and is hereby DISMISSED.