Arthur C. EWING a/k/a A. Clifford
Ewing;  Maxine H. Ewing,
Plaintiffs–Appellees,

v.

UNITED STATES of America,
Defendant–Appellant.

No. 89–1756.

United States Court of Appeals,
Fourth Circuit.

Argued April 5, 1990.

Decided Sept. 17, 1990.

Mary Frances Clark, Tax Div., U.S. Dept. of Justice, Washington, D.C., argued (Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen, William S. Estabrook, Tax Div., U.S. Dept. of Justice, Washington, D.C., Thomas J. Ashcraft, U.S. Atty., Charlotte, N.C., on brief), for defendant-appellant.

J. Randall Groves, argued (Steve C. Horowitz, Joyce W. Wheeler, on brief), Weinstein & Sturges, P.A., Charlotte, N.C., for plaintiffs-appellees.

Before HALL and SPROUSE, Circuit Judges, and SMITH, District Judge for the Eastern District of Virginia, sitting by designation.

SPROUSE, Circuit Judge:

The underlying action was initiated in the district court by Arthur C. Ewing and Max-

ine H. Ewing (taxpayers) for return of sums they had remitted to the Internal Revenue Service after tax audits resulted in an agreement by the taxpayers and the government concerning deficiencies for previous tax years. Although the taxpayers forwarded to the IRS the sums for the agreed deficiencies, the IRS failed to "assess" the deficiencies within the statutory period for assessment.[1] *See* 26 U.S.C. § 6501. The district court granted summary judgment in favor of the taxpayers. 711 F.Supp. 265. The government appeals.

The taxpayers, arguing in support of the judgment in their favor, contend that their agreement to the amounts of their deficiencies was contingent upon formal assessment of the deficiencies; that since the assessments were not made within the time allowed by § 6501, they have no tax liabilities for the deficiencies; and that they therefore are entitled to the return of the sums they forwarded to the IRS in fulfillment of their agreement. We disagree, and reverse the district court's judgment with regard to the amounts that were paid prior to the running of the assessment period.

## I

Taxpayers filed joint federal income tax returns for the years 1976 through 1979 and paid the taxes that were reflected on their returns. Later the IRS audited the returns and proposed adjustments resulting in deficiencies. After negotiation, the government and the taxpayers executed Closing Agreements (Forms 906) for these years purporting to settle their dispute as to the adjustments and deficiencies.[2] Additionally, the taxpayers executed Forms 1902–B and 4549—"Reports of Income Tax Examination Changes." The agreements were executed by taxpayers on July 31, 1984. Some two weeks later, in mid-August, the agreements were approved by the Commissioner's authorized representative. The next day, the taxpayers forwarded to the IRS their check in the amount of $258,956.18. Notations on the check indicated how the sum was to be apportioned among tax years; the year-by-year amounts corresponded exactly with the deficiency amounts to which the taxpayers had agreed. Taxpayers remitted additional checks to cover interest on the deficiencies.

Some time after their remittances, taxpayers became aware that the IRS had not formally assessed the deficiencies within the time allowed by statute and their agreed extension of the statutory period.[3] After informal claims for refund were denied, taxpayers brought this action in the district court in June of 1988 for return [4] of the sums they had paid for deficiencies and interest.

After a hearing on cross-motions for summary judgment, the district court granted judgment in the amount of $333,-

---

1. This failure apparently was due to intra-office procedural deficiencies introduced when the IRS converted to a new computerized accounting system.

2. The agreements executed by the parties are each characterized as "Closing Agreement On Final Determination Covering Specific Matters." Each agreement contains language similar to the following:

    WHEREAS, a dispute has arisen between the parties as to the amount of the taxpayer(s)' distributive share of income, gain, loss, deduction or credit from [name of company];
    WHEREAS, the parties wish to determine with finality the taxpayer(s)' distributive share of income, gain, loss, deductions, or credit for the year(s) 1976 from the [company]....
    *See* 26 U.S.C. § 7121 (authorization for and finality of closing agreements).

3. Deficiencies must be assessed within three years of filing the return, 26 U.S.C. § 6501(a), unless this period is extended by agreement between the taxpayer and IRS, § 6501(c)(4). In this case, taxpayers had agreed to extend the time for assessment to December 31, 1984.

4. The complaint stated, "This is an action ... for the recovery of individual income taxes and interest, erroneously or illegally assessed or collected from the Plaintiffs, and for which claims for refund were erroneously or illegally disallowed." The parties argue whether the Ewings' action was for a "refund" or a "return" and the effect if it is one or the other. However, the fact that the Ewings may have misused the word "refund" in their administrative application is of no significance. We look to the substance of the contentions they advanced both below and on appeal.

641.17[5] in favor of the taxpayers, ruling essentially that the agreements admitting to the deficiencies were subject to a condition that the government comply with all the provisions of the Internal Revenue Code, including the requirement of § 6501 that assessments be made within three years after filing of returns or by the end of any agreed extension period. The district court in effect concluded that the taxpayers' checks were remitted to the IRS not as payments but as deposits conditioned on a subsequent assessment and that—since the IRS did not timely assess the deficiencies—the taxpayers were entitled to a return of the deposits. The government on appeal contends that the remittances were payments of tax which the government is entitled to retain even if no timely assessment was made.

## II

It should be apparent from the above discussion that taxpayers are not contending they initially paid the correct amount of tax when they filed their returns for tax years 1976–1979. By executing the Closing Agreements and associated forms, they acknowledged they owed taxes for those years, and they do not now contend that those Closing Agreements were invalid. Rather, they seek to gain advantage from the IRS's error of not making timely assessment.

▮▮▮▮ Taxpayers point out correctly that the appellate courts' task in tax cases such as this is not that of weighing equities, but of determining technical application of the law. We agree with the well-established view that tax laws are technical and, for the most part, are to be accordingly interpreted. *E.g., Lewyt Corp. v. Commissioner,* 349 U.S. 237, 240, 75 S.Ct. 736, 739, 99 L.Ed. 1029 (1955); *Brafman v. United States,* 384 F.2d 863, 867–68 (5th Cir.1967); *Richardson v. Smith,* 301 F.2d 305, 306 (3d Cir.) ("taxation is a game which must be played strictly in accordance with the rules"), *cert. denied,* 371 U.S. 820, 83 S.Ct.

36, 9 L.Ed.2d 60 (1962). *But cf. United States v. Dalm,* —— U.S. ——, 110 S.Ct. 1361, 1368 n. 6, 108 L.Ed.2d 548 (1990) (applying a "common sense" approach to the definition of "overpayment"). Even given technical interpretation and application, however, we conclude that the 1984 remittances of the Ewings were payments of principal and interest on their tax deficiencies (as agreed to by them) properly collected by the IRS, and that the failure of the government to comply with the requirements of 26 U.S.C. § 6501 does not entitle taxpayers to return of those monies.

Title 26 U.S.C. § 6501, "Limitations on assessment and collection," provides:

(a) **General rule.**—Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.

\*     \*     \*     \*     \*     \*

(c) **Exceptions.**—

\*     \*     \*     \*     \*     \*

(4) **Extension by agreement.**—Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title ... both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon.

The taxpayers contend that their remittances to the IRS were not payments of tax, but deposits, and that they are entitled to their return because the IRS did not comply with the conditions on which it was to be permitted to apply the deposit to their

---

**5.** This is the amount calculated by the district court to have been remitted by the taxpayers for deficiencies and interest for the tax years 1976 to 1979. Taxpayers concede there was an error in the calculation and that the amount should have been less. *See infra,* Part V.

tax liabilities—*i.e.*, making formal assessments within the appropriate time period. Their argument is that, prior to assessment, there can be no tax liability and thus no "payment" of tax.[6] They suggest that, once the statutory period for assessment is past, it is impossible for the government to create a tax liability, and therefore any "deposits" made in anticipation of assessment must be returned. Although taxpayers have cited to cases in which the reasoning infers support of their position, we believe the weight of authority and the plain meaning of the statute compel a different conclusion.

### III

There has been no firm resolution of the question of whether a taxpayer is entitled to return of monies remitted in accordance with their admitted tax deficiencies simply because the IRS failed to assess within the time requirements of § 6501. Several cases from the 1930's support the government's position that it may retain such payments,[7] but those holdings arguably were brought into question by the Supreme Court case of *Rosenman v. United States*, 323 U.S. 658, 65 S.Ct. 536, 89 L.Ed. 535 (1945). That case and subsequent decisions by several of our sister circuits have entertained questions necessarily implicating the issue of the necessity of assessment, but the outcomes in each of those cases hinged on distinct issues relating to "payment." [8]

*Rosenman*, on which taxpayers rely heavily, decided whether estate taxes had been "paid" when remitted by the taxpayer or when later assessed by the IRS. After receiving an extension of time for filing the estate tax return, the Rosenman estate delivered a check to the IRS, noting "This payment is made under protest and duress, and solely for the purpose of avoiding penalties and interest, since it is contended by the executors that not all of this sum is legally or lawfully due." *Id.* at 660, 65 S.Ct. at 537. The check was delivered on December 24, 1934. The IRS placed the delivered funds in a suspense account to the credit of the estate. Later, the estate filed its return. The IRS audited the return and assessed a deficiency, and the estate paid additional taxes.

In 1940, six years after the original check had been remitted, the estate filed a claim for refund, which was rejected. The estate then filed suit in the Court of Claims, which held that recovery was barred by the three-year statute of limitations[9] running from the date the taxpayer's remittance was forwarded. The Supreme Court, reversing, held that the statute of limitations commenced running only when the Commissioner assessed the delinquency after the audit. *Id.* at 661, 65 S.Ct. at 537. In support of that conclusion, the Court stated:

> [O]n December 24, 1934, the taxpayer did not discharge what he deemed a liability

---

**6.** In what seems to us to be a somewhat inconsistent position, however, the taxpayers concede that a payment results when a taxpayer forwards a remittance along with a tax return, even though that amount is not yet formally assessed. *See Hill v. United States*, 263 F.2d 885, 886 (3d Cir.1959). Taxpayers distinguish their situation on the basis that it involves a deficiency rather than an initial return.

**7.** *Crompton & Knowles Loom Works v. White*, 65 F.2d 132 (1st Cir.), *cert. denied*, 290 U.S. 669, 54 S.Ct. 89, 78 L.Ed. 578 (1933); *Meyersdale Fuel Co. v. United States*, 44 F.2d 437, 446, 70 Ct.Cl. 765 (1930); *Anderson v. United States*, 15 F.Supp. 216, 224–25, 83 Ct.Cl. 561 (1936), *cert. denied*, 300 U.S. 675, 57 S.Ct. 668, 81 L.Ed. 880 (1937); *Muir v. United States*, 3 F.Supp. 619, 621, 78 Ct.Cl. 150 (1933).

**8.** These cases have two basic fact situations: (1) deciding whether assessment was needed to fix

the time of payment for purposes of calculating the statute of limitations for filing for refund; and (2) determining when/whether payment was made for purposes of calculating interest. No appellate case since *Rosenman* deals directly with the issue of this case: whether amounts remitted to the IRS were amounts "erroneously or illegally collected" because of failure of the IRS to make timely assessment. *But see Becker Bros. Inc. v. United States*, 61 A.F.T.R.2d (P–H) 88–1147, 88–1150 to –1151, 88 U.S. Tax Cas. (CCH) 9262, 1988 WL 75234 (C.D.Ill.1988).

**9.** The statute involved in *Rosenman* was 26 U.S.C. § 910 (1939) (now 26 U.S.C. § 6511(a)) which limits the time in which a taxpayer may file a claim for refund. The limitations statute involved here, 26 U.S.C. § 6501, limits the time in which the government may assess a deficiency.

nor pay one that was asserted. There was merely an interim arrangement to cover whatever contingencies the future might define.

*Id.* at 662, 65 S.Ct. at 538.

The circuit courts have divided in their application of *Rosenman.* The Fifth Circuit has created a *per se* rule that there simply can be no payment of taxes prior to assessment. *Thomas v. Mercantile Nat. Bank,* 204 F.2d 943 (5th Cir.1953); *see also Ford v. United States,* 618 F.2d 357, 361 (5th Cir.1980) (following *Thomas* as precedential, but opining that *Thomas* should be overruled). The Eight Circuit also took this approach in *United States v. Dubuque Packing Co.,* 233 F.2d 453 (8th Cir.1956), holding that until assessment there is no tax liability defined and thus there can be no payment of tax. *See also Plankinton v. United States,* 267 F.2d 278, 280 (7th Cir.1959) (generally remittances prior to the time liability is defined are not payments).

In *Rosenman,* however, the fact that the IRS had not assessed the estate taxes prior to the estate's initial transmittal was only one factor discussed by Justice Frankfurter. More dramatic was the estate's notation of paying under protest and duress with the intention of contesting the tax amount. The reasoning of *Rosenman* hardly supports the *Thomas/Dubuque* conclusion that there never can be tax liability without a previous tax assessment. To the contrary, it gives weight to the notion that assessment is but one factor in consideration of whether and when a remittance becomes a payment of a valid tax liability.

A number of courts have disagreed with *Thomas* and *Dubuque,* concluding that *Rosenman* does not foreclose the possibility that a remittance made prior to assessment can be a payment of tax. *Ameel v. United States,* 426 F.2d 1270 (6th Cir.1970); *Fortugno v. Commissioner,* 353 F.2d 429 (3d Cir.1965), *cert. dismissed,* 385 U.S. 954, 87 S.Ct. 337, 17 L.Ed.2d 302 (1966); *Charles*

*Leich & Co. v. United States,* 329 F.2d 649, 165 Ct.Cl. 127 (1964); *Hill v. United States,* 263 F.2d 885 (3d Cir.1959); *Rose v. United States,* 256 F.2d 223 (3d Cir.1958); *Lewyt Corp. v. Commissioner,* 215 F.2d 518 (2d Cir.1954), *aff'd in part and rev'd in part on other grounds,* 349 U.S. 237, 75 S.Ct. 736, 99 L.Ed. 1029 (1955). The *Ameel* court summarized these holdings as to what constitutes "payment":

> (1) a remittance is not per se "payment" of the tax; (2) a remittance that does not satisfy an asserted tax liability should not be treated as the "payment" of a tax; and (3) an essential factor in "payment" before assessment is the satisfaction or discharge of what the taxpayer deems a liability.

426 F.2d at 1273 (quoting 10 J. Mertens, *Law of Federal Income Taxation* § 58.27 at 79 (1964)).

These cases (and the dicta in *Ford* ) reason that, for purposes of deciding whether a remittance was a payment of tax, formal assessment is only one factor to be considered. Other factors deemed relevant have included when the tax liability is defined, the taxpayer's intent in remitting the money, and how the IRS treats the remittance upon receipt.[10] In our view, the rule that tax liability is not premised on a *per se* requirement of previous assessment is the better reasoned one and represents the clear weight of authority.

## IV

■ We are also of the view that § 6501(a) plainly and fully describes the consequence of the IRS's failure to comply with its terms. To reiterate, it states: "the amount of any tax ... shall be assessed within three years after the return was filed ... and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period." This section simply mandates that the United States has no authority to collect a tax forcibly after the applica-

---

**10.** In this case, the IRS treated the Ewings' principal remittance as an "advance payment." While this factor, perhaps, argues in the Ewings' favor, we do not find it dispositive because we · think it more significant that the Ewings voluntarily made the remittance in accordance with their agreed tax deficiencies.

ble period for assessment has expired. It does not forbid the government from collecting and retaining taxes voluntarily paid without assessment and which do not constitute an overpayment.

We are persuaded by the views expressed in *Hill*,[11] *Ford, Fortugno, Lewyt,* and *Ameel* (which are supported by our reading of *Rosenman*), and by the language of 26 U.S.C. § 6501(a) that a payment results from the remittance by a taxpayer concomitant with the recognition of a tax obligation whether by filing with a return, resolution of a dispute by an agreement, as in this case, or otherwise. The documents executed by the IRS and the Ewings were unadorned agreements recognizing and settling a tax dispute. We see no indication of, nor for that matter purpose in, the Ewings conditioning their agreement on a timely assessment. We thus find that the Ewings' remittances made in accordance with their Closing Agreements and related documents and received by the government prior to the closing of the assessment period were payments of tax which the government is entitled to retain.

## V

■ We do agree with the Ewings that a different analysis applies with respect to the amounts they paid in 1985.[12] While the

bulk of the remittances for the 1976–1979 deficiencies were made prior to the expiration of the § 6501 period for assessment (December 31, 1984), taxpayers also remitted $71,158.24 in 1985 to cover interest on the deficiencies. Section 6401(a) of Title 26 states:

> The term "overpayment" includes that part of the amount of the payment of any internal revenue tax which is assessed or collected after the expiration of the period of limitation properly applicable thereto.

Since the amounts paid in 1985 were "collected" by the IRS outside of the period for assessment, with no assessment having been made, they come within this definition of "overpayment." *See Diamond Garner Corp. v. Commissioner,* 38 T.C. 875, 879–81 (1962) (payment of a barred tax liability, whether voluntary or involuntary, is overpayment subject to mandatory refund); *cf. Guerard v. United States,* 553 F.2d 104, 212 Ct.Cl. 591 (1977) (agreeing that tax collected after expiration of § 6501 period is an overpayment under § 6401); *Estate of Goetz v. United States,* 286 F.Supp. 128, 131 (W.D.Mo.1968) (government conceded that interest payment which was not in hands of IRS prior to running of statute nor prior to assessment was subject to refund).[13]

> It is true that the Government does not provide for the taxpayer any such simple method of ascertaining how much he owes as is indicated by the price tag on the tie. Nevertheless, the statutes and regulations do provide a set of rules in both federal estate tax and income tax and millions of taxpayers make their returns and write out their checks either as the rules direct or as the taxpayers think the rules direct.
>
> 263 F.2d at 886. Note that, in the case *sub judice,* the taxpayers *did* have a "price tag"—the amounts to which they had agreed.

**11.** In *Hill,* the Third Circuit said:

> In our view the problem involved is a simple one. We said in *Busser v. United States,* 130 F.2d 537, 539 (3d Cir.1942), that the common use of the term "payment" in both laymen's language and lawyers' language explains it as "something given to discharge a debt or obligation." Mr. Justice Frankfurter pointed out in *Rosenman v. United States,* (1945) 323 U.S. 658, 661, 65 S.Ct. 536, 537, 89 L.Ed. 535, that the three year requirement was "couched in ordinary English" and that "Congress has evidently meant what these words ordinarily convey." If a man in a haberdashery shop sees a tie marked $3.00 on the counter, picks it up and hands it to a clerk with three $1.00 bills we think there is no doubt in his mind or the clerk's mind that the money is being tendered as payment for the tie. To us this case is just as clear. A taxpayer makes out his return form; he accompanies it with a check for the amount he figures he owes. If that is not the sending of money in discharge of the debt it is hard to figure out what a "payment" can be.

**12.** Because the district court ruled that timely assessment was a condition to the government retaining *any* of the monies, it did not consider the difference between 1984 and 1985 payments.

**13.** At first glance, it might seem that § 6401(a) would also apply to the amounts remitted in 1984, but, in accordance with the reasoning of the previous sections of this opinion, a payment of properly owed taxes within the statutory peri-

■ The government essentially admits that the 1985 payments come within the § 6401 definition of overpayment. It argues, however, that it should be allowed to retain these amounts because of the language of 26 U.S.C. § 7121, which makes closing agreements binding on both parties. We do not agree that § 7121 precludes the provisions of § 6401 from taking effect. The closing agreements executed by taxpayers simply agreed to the amount of income, gains, losses, deductions, and credits attributable to various businesses in which taxpayers were partners. *See infra* note 2. They did not agree that they would abstain from claiming any refund that might be available to them under § 6401. *Cf. Smith v. United States*, 850 F.2d 242, 245 (5th Cir.1988) (closing agreement which determined losses from a venture did not bar IRS from calculating tax and assessing penalties and interest as provided by law).[14]

Pursuant to 26 U.S.C. § 6402(a), $28,-941.29 of the 1985 payments were applied to tax liabilities for years other than those at issue here. Taxpayers concede that they are not entitled to return of that amount. The balance should be refunded in accordance with 26 U.S.C. §§ 6401 & 6402.

VI

In view of the above, the judgment of the district court is reversed and remanded for appropriate actions consistent with the views expressed in this opinion.

REVERSED AND REMANDED.

---

od for assessment is not an overpayment even if there is no formal assessment. *See also Crompton & Knowles Loom Works v. White*, 65 F.2d 132 (1st Cir.), *cert. denied*, 290 U.S. 669, 54 S.Ct. 89, 78 L.Ed. 578 (1933). Indeed, the Ewings specifically disavow any argument that § 6401(a) should apply to their 1984 remittances.

**14.** *See also* Treas.Reg. § 301.7121–1(d)(2) (1962): "Any tax or deficiency in tax determined pursuant to a closing agreement shall be assessed and collected, and any overpayment determined pursuant thereto shall be credited or refunded, in accordance with the applicable provisions of law."