T.C. Memo. 1999-182


UNITED STATES TAX COURT


LEON S. MALACHINSKI, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 13501-94.                        Filed June 1, 1999.


<u>Michael G. Boylan</u>, for petitioner.

<u>Joseph T. Ferrick</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


GALE, <u>Judge</u>:  Respondent determined a deficiency of $43,750
in petitioner's Federal income taxes for 1980 and an addition to
tax of $2,188 under section 6653(a).[1]  Respondent also determined

---

[1] Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the year in issue, and
(continued...)

that, once the deficiency is determined, petitioner is liable for increased interest on an underpayment attributable to a tax-motivated transaction as defined in section 6621(c).  After concessions,[2] the issues remaining for decision are: (1) Whether petitioner executed a valid consent to extend the period of limitations for assessment and collection of the taxes and addition to tax at issue and (2) whether petitioner is entitled to a credit of $20,400 for the taxable year in issue.

## FINDINGS OF FACT

The parties filed a stipulation of facts, a supplemental stipulation of facts, and a second supplemental stipulation of facts, each with attached exhibits.  The facts reflected therein are so found and are incorporated herein.

Petitioner Leon S. Malachinski was a resident of Naperville, Illinois, when the petition herein was filed.  Petitioner and Wynne Malachinski (Wynne) were married in May of 1980.  During the taxable year in issue, they both were physicians.  For a time, they operated a medical practice together.  They filed a

---

[1](...continued)
all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The parties have executed a stipulation of settled issues wherein they have settled all questions relating to the amount of, and petitioner's liability for, the Federal income taxes and addition to tax and increased interest for the year at issue, other than the questions set forth above.

joint Federal income tax return for their taxable year 1980 on April 15, 1981.

Late in 1982 or early in 1983, respondent's agents called petitioner with respect to the 1980 Federal income tax return. Petitioner then sought the advice of Vincent Arnone, his tax return preparer. Petitioner and Wynne granted a power of attorney to Mr. Arnone and to attorney Eugene F. LaPorte on March 31, 1983.

Wynne filed for divorce in March of 1983 but delayed telling petitioner of the filing until approximately a month later.

On May 23, 1983, revenue agent Alan Neubauer sent a letter addressed to petitioner and Wynne, requesting that they sign and return an enclosed Form 872-A, Special Consent to Extend the Time to Assess Tax, for their 1980 tax year. On or about June 8, 1983, the Internal Revenue Service received the Form 872-A, which had been dated June 1, 1983, and which bore the handwritten names of both petitioner and Wynne. An official of the IRS countersigned the Form 872-A on June 8, 1983.

Three days later, on June 11, 1983, petitioner and Wynne granted another power of attorney to John R. Ostrand, C.P.A., and Stephen B. Mack, C.P.A. The power of attorney was originally prepared on May 23, 1983.

On September 1, 1983, Wynne issued a separate power of attorney naming as her representatives before the IRS two

attorneys, Anthony G. Scariano and Justino D. Petrarca, and a certified public accountant, Michael J. Moxley.

Petitioner and Wynne continued to practice medicine together until they were divorced in March of 1984.

On March 27, 1984, petitioner filed a separate tax return for his taxable year 1982. The next month, acting on advice from one of his advisers, petitioner sent to the IRS a $20,400 remittance with respect to his and Wynne's Federal income tax account for 1980. The IRS prepared a voucher, with a handwritten entry reflecting this amount as a "cash bond". A section of the voucher was also checked, indicating that the amount was an "Advance payment on deficiency". The voucher did not have a separate section for indicating that the remittance was in the nature of a cash bond or a deposit.

Petitioner's representative, Mr. Mack, met with respondent's agent Neubauer on June 29, 1984, to discuss issues relating to petitioner's taxes. On July 24, 1985, respondent issued an examination report to petitioner and to Wynne for their 1980 tax year, indicating, inter alia, that they had a deficiency in income tax of $91,086.

On August 20, 1985, petitioner executed his third power of attorney, this time naming Glenn Aquino, a certified public accountant with the accounting firm Coopers & Lybrand. On the same date, Mr. Aquino filed a protest with respondent on behalf

of petitioner and Wynne. A week later, respondent returned the protest, seeking additional information. In response, Mr. Aquino filed a revised protest on September 12, 1985.

A child custody contest arose between petitioner and Wynne. In late September or early October of 1985, petitioner filed for sole custody of the two Malachinski children. In May of 1986, however, Wynne was awarded sole custody of the children. In October of 1987, an appellate court reversed the award of custody and granted full custody of the children to petitioner.

In April of 1988, the IRS transferred to petitioner's 1982 Federal income tax account the $20,400 remittance that petitioner had made with respect to his and Wynne's 1980 account. The IRS transcript of account indicates that approximately 6 months later, in October 1988, the $20,400, plus $902 in interest, was refunded. The IRS no longer has a copy of the check by which the refund was paid.

On December 14, 1988, petitioner executed a fourth power of attorney, naming attorney Michael G. Boylan and authorizing him to represent petitioner before the IRS. On August 16, 1989, Mr. Boylan wrote to the IRS, stating that petitioner had not been able to secure Wynne's approval of a proposed settlement.

In the meantime, Claudine Mellerke became an employee and a friend of Wynne's. Late in 1989, Wynne began to complain bitterly about petitioner to Ms. Mellerke. In 1992, Ms. Mellerke

became concerned that Wynne might carry out some threats she had made against petitioner's life.  Ms. Mellerke's concerns ultimately came to the attention of the local police.  At the time of trial in this case, Wynne (now known as Wynne Superson) was incarcerated in the Metropolitan Correctional Center in Chicago, Illinois, awaiting sentencing after having been convicted of a violation of 18 U.S.C. section 1958 (1994), use of interstate commerce facilities in the commission of murder-for-hire.  The intended victim of her scheme was petitioner.

The notice of deficiency in this case was issued on May 3, 1994, and on July 28, 1994, petitioner timely filed a petition. In September of 1995, petitioner filed an amended petition, asserting for the first time that the period of limitations for assessment of the taxes and addition to tax at issue had expired. In supporting documents he maintained that he had not signed, authorized, or ratified the consent to extend the period of limitations relating to his 1980 taxable year.

Respondent's counsel subsequently conducted a deposition of Wynne with respect to the issues in this case, but she refused to answer any questions, citing her privilege against self-incrimination.

OPINION

I. The Period of Limitations for 1980

Section 6501(a) provides (with certain exceptions) that respondent shall assess deficiencies in income taxes within 3 years after the return is filed. Section 6501(c)(4) provides an exception to this 3-year provision by allowing a taxpayer and respondent to agree in writing to extend the period for assessment, if such agreement is made before expiration of the 3-year period.

Under the Court's Rules, the defense of expiration of the period of limitations is an affirmative defense, and the party raising it must specifically plead it and carry the burden of proving its applicability. See Rules 39, 142(a). As further explained in Adler v. Commissioner, 85 T.C. 535, 540 (1985):

> Where the party pleading such issue makes a showing that the statutory notice was issued beyond the normally applicable statute of limitations, however, such party has established a prima facie case. At that point, the burden of going forward with the evidence shifts to the other side, and the other party has the burden of introducing evidence to show that the bar of the statute is not applicable. Where the other party makes such a showing, the burden of going forward with the evidence then shifts back to the party pleading the statute, to show that the alleged exception is invalid or otherwise not applicable. The burden of proof, i.e., the burden of ultimate persuasion, however, never shifts from the party who pleads the bar of the statute of limitations. [Citations omitted.]

In this case, it is undisputed that the normally applicable period of limitations for assessing and collecting the tax

expired on April 15, 1984, 3 years after petitioner filed his 1980 return, unless the period was extended by agreement. There is also no disagreement that respondent issued the statutory notice on May 3, 1994, more than 10 years after April 15, 1984. Petitioner thus has made a prima facie showing that the notice is untimely. That demonstration placed upon respondent the burden of producing evidence that the bar effected by expiration of the period of limitations is inapplicable. Respondent has made such a showing by providing a facially valid Form 872-A, indicating that both petitioner and Wynne agreed to waive the period of limitations applicable to their 1980 taxable year. Production of the Form 872-A placed upon petitioner the burden of showing that the agreement exemplified in the Form 872-A is inapplicable.

Petitioner has undertaken to show that the agreement to extend the period of limitations is invalid because he never signed, authorized, or ratified the Form 872-A in issue. His signature on that form, he asserts, was forged.

Section 6064 provides that "The fact that an individual's name is signed to a * * * document shall be prima facie evidence for all purposes that the * * * document was actually signed by him."

To overcome the presumption that he signed his name to the consent, petitioner has offered the expert report of Diane Marsh, a forensic document examiner. Ms. Marsh has been certified by

the Independent Association of Questioned Document Examiners, the
World Association of Document Examiners, and the American Board
of Forensic Examiners.  Her report identified 20 sample
signatures of petitioner, with respect to which she compared the
signature on the consent.  The report indicated that "All
standard testing procedures were used in this examination".  Her
report came to the following conclusion:

> After an examination of all the documents submitted, it
> is my opinion that Dr. Malachinski did not write the
> name "L.S. Malachinski" on the document at issue, the
> IRS Consent Form dated June 1, 1983.  In addition, it
> is my opinion that the same individual wrote both dates
> of "6/1/83."

Ms. Marsh's report did not provide the facts which formed
the basis for her conclusion that petitioner had not signed the
consent.  Nor did the report set forth Ms. Marsh's reasons for
that conclusion.  At trial, petitioner attempted to elicit from
Ms. Marsh the factual basis for her conclusion.  Respondent
objected to this attempt.

Rule 143(f)(1) in pertinent part states:

> (f)  Expert Witness Reports:  (1) Unless otherwise
> permitted by the Court upon timely request, any party
> who calls an expert witness shall cause that witness to
> prepare a written report for submission to the Court
> and to the opposing party.  The report * * * shall
> state the witness' opinion and the facts or data on
> which that opinion is based.  The report shall set
> forth in detail the reasons for the conclusion, and it
> will be marked as an exhibit, identified by the
> witness, and received in evidence as the direct
> testimony of the expert witness, * * *  An expert
> witness' testimony will be excluded altogether for

failure to comply with the provisions of this paragraph, unless the failure is shown to be due to good cause and unless the failure does not unduly prejudice the opposing party, such as by significantly impairing the opposing party's ability to cross-examine the expert witness * * *.

Petitioner has not shown that the failure of Ms. Marsh's report to include the facts, data, and analysis that underlie her opinion is due to good cause. Moreover, we believe that permitting direct testimony in addition to that submitted in the report would have unduly prejudiced respondent's ability to cross-examine Ms. Marsh. We accordingly sustain respondent's objection. Petitioner's expert's direct testimony is restricted to the material contained in the expert report.

In rebuttal to Ms. Marsh's report, respondent presented the report and testimony of James M. Davidson, an employee of the IRS who is also a certified document examiner. Mr. Davidson works at respondent's National Forensic Laboratory in Chicago. He is a member of the American Society of Questioned Document Examiners and has been certified by the American Board of Forensic Document Examiners. Mr. Davidson compared the signature on the consent to 26 known exemplars of petitioner's signature. Mr. Davidson determined that the exemplars fell into three groups: 13 were quickly written abbreviated last names; 10 were formally written with distinct letter definition, and three were shortened, quickly written signatures. Mr. Davidson found exemplars in the

first two categories to be of minimal value in making the comparison.  He determined that the "L.S. Malachinski" signature on the consent document was most similar to the last of these three categories.  He concluded, however, that he could not determine whether the signature on the consent was genuine.  His inability to do so was based upon his determination that the three signatures in the third category were "not enough of a representative sample of the writer for me to make any determinations."

The testimony of expert witnesses may be helpful to the Court in determining factual controversies.  We are not bound by an expert's opinion, however, and we may accept or reject such testimony when, in our best judgment, based on the record, it is appropriate to do so.  Thus, while we may choose to accept an expert's opinion in its entirety, we may also be selective in the use of any portion of that opinion.  See Seagate Tech., Inc. v. Commissioner, 102 T.C. 149, 186 (1994).

The reports of the experts in this case are inconsistent-- Ms. Marsh believes that the exemplars suffice to show that petitioner did not execute the questioned signature, and Mr. Davidson believes that the exemplars do not permit such a conclusion.  Taking both opinions into account, and having scrutinized the documents ourselves, we are not convinced that the signature at issue is a forgery.  Thus, petitioner has failed

to overcome the statutory presumption that he signed the consent.[3]

Circumstantial evidence reinforces our finding that petitioner executed the consent. Petitioner first asserted in 1995, some 12 years after it was signed, that his signature on the consent was forged. During that 12-year period, he hired four sets of professional advisers to deal with the IRS's examination of his income tax liabilities. We do not believe that, during the 12 years that followed the explicit waiver of the period of limitations, none of petitioner's professional advisers consulted with him concerning the validity of that waiver. We believe, rather, that they did so, and that they learned from petitioner that he had signed the consent. Had petitioner told them otherwise, they would have sought to terminate respondent's proceedings against petitioner for 1980

---

[3] The Court permitted petitioner to proffer additional testimony of Ms. Marsh as to the facts and reasons for her conclusion. In the proffer, she asserted specific concerns about the signature appearing on the consent. Specifically, she noted characteristics of the loop on the "L" of petitioner's first name, the angle of the bottom of the "S" in petitioner's middle initial, and the absence of a loop at the end of the "short" version of petitioner's signature. These concerns, even if properly presented, would not have changed our conclusion. The Court's own examination of the exemplars indicates that the presence or absence of the questioned characteristics was not confined to the signature on the consent. The Court's examination of the evidence reinforces its decision to accept the conclusion of respondent's expert--that is, that the evidence of record does not permit a finding that petitioner did not sign the consent.

immediately.  That did not happen.  The conduct of petitioner and his advisers is thus plainly inconsistent with the claim that the consent was forged.  See Kim v. Commissioner, T.C. Memo. 1996-142; Eddins v. United States, 71 AFTR 2d 93-795, 93-1 USTC par. 50,027 (S.D. Miss. 1992), affd. without published opinion 9 F.3d 103 (5th Cir. 1993).

Other circumstances support our finding.  Typewritten portions of the power of attorney to Messrs. Ostrand and Mack indicate that petitioner and Wynne had contacted them on or before May 23, 1983.  The consent was executed on June 1, 1983, and 10 days later petitioner and Wynne both signed the power of attorney.  We think it unlikely that Wynne would forge petitioner's signature to a document extending the statute of limitations for 1980, and then, 10 days later, cooperate with him in hiring advisers to represent them for that very year.  In such circumstances, her duplicity would have been too easily uncovered.

Additionally, in April of 1984, petitioner, at the urging of his advisers, paid $20,400 to the IRS with respect to his and Wynne's 1980 taxable year.  Petitioner made this payment after the period of limitations for that year would have expired, unless there were in effect a valid waiver.  Competent professionals would not advise a client to make a payment with respect to a tax liability which could not be collected.

Plainly, payment of the $20,400 indicates that petitioner's advisers understood that he and Wynne had validly consented to an extension of that period.

Petitioner's advisers conducted additional discussions with the IRS in the latter part of 1984, but in July of 1985, the IRS sent petitioner and his adviser a letter advising petitioner of a proposed liability of more than $90,000 for his and Wynne's taxable year 1980. Again, the advisers made no suggestion that the collection of the taxes at issue was time-barred. The last professional adviser hired, in December 1988, was Mr. Boylan, who ultimately represented petitioner before this Court. Almost 7 years after Mr. Boylan was hired, the question of the validity of the consent first arose.

In light of all the foregoing, we do not accept petitioner's assertion that his signature to the consent was forged.

Petitioner urges strenuously that Wynne possessed enough animosity toward him to forge documents provided to the IRS. He points to the startling evidence that Wynne has been convicted of trying to have him murdered. Evidence of Wynne's plotting, however, came to light only in 1989, following a bitter custody battle. Thus, although the evidence is dramatic, it is not particularly persuasive as to Wynne's intentions or state of mind more than 6 years earlier, when the consent was executed. We conclude that Wynne's animosity in 1989 is too attenuated and too

remote in time to support a finding that she forged petitioner's name to the consent document. Petitioner's arguments notwithstanding, the notice of deficiency for his and Wynne's 1980 Federal income taxes is valid and timely.

We would reach this conclusion even if we considered some additional testimony which, petitioner asserts, supports his contention that Wynne forged his signature. Petitioner states that Wynne made some statements late in 1989 or afterwards to her friend and employee Ms. Mellerke and proffers Ms. Mellerke's statements about those statements. Those statements were that Wynne "had contacted the IRS and had reported Dr. Malachinski for several things that he had not done, and also she provided a document to the IRS shortly before they were divorced that he was not aware of". This document, Wynne is said to have stated, was so damaging to petitioner that "he would be feeling the effects of it for the rest of his life".

Respondent objects to the introduction of such testimony, asserting that such testimony would be inadmissible hearsay. We need not address this objection, however, because the proffered testimony, even if admitted, is too vague and inconclusive to be of evidentiary value in determining whether petitioner's signature on the consent was forged. Wynne's assertion that she "provided a document to the IRS shortly before they were divorced" fails to identify this document as the consent Form

872-A.  Nor do the proffered statements indicate that Wynne or anyone else forged petitioner's name to that document, or even that Wynne herself signed it.

II.  The Payment of $20,400 in 1984

In April of 1984, acting on professional advice, petitioner sent to the IRS a remittance of $20,400 with respect to his and Wynne's anticipated joint Federal income tax liability for 1980. Four years later, in April of 1988, the IRS transferred the $20,400 to petitioner's individual 1982 Federal income tax account.  The IRS transcripts of account indicate that about 6 months thereafter, in October of 1988, the $20,400, plus $902 in interest, was refunded.  This entry in the IRS records was made 6 years prior to respondent's issuance of the notice of deficiency asserting that petitioner was liable for 1980 taxes of $43,750.

Petitioner argues that he did not request either the crediting of the $20,400 to his 1982 taxable year or the refund of that amount.  He denies that he ever received the refund; instead, he speculates, Wynne intercepted the check and forged it.  He concludes that, even if he does not prevail upon the statute of limitations argument, he is entitled to credit for the $20,400 against the deficiency he has agreed is owing for 1980 in the absence of a statute of limitations defense.

This Court is a court of limited jurisdiction, and we may exercise our jurisdiction only to the extent authorized by Congress. See Savage v. Commissioner, 112 T.C. 46, 48 (1999); Pen Coal Corp. v. Commissioner, 107 T.C. 249, 254 (1996); Kluger v. Commissioner, 83 T.C. 309, 314 (1984). Our authorization encompasses the determination of deficiencies pursuant to section 6214(a) and of overpayments, subject to specific limitations, under section 6512(b). Obviously, the provisions of section 6512(b) are not applicable because petitioner herein has conceded liability for the deficiency; he is not claiming any overpayment. Accordingly, to demonstrate that this Court has jurisdiction, petitioner must place this $20,400 remittance within the scope of a deficiency.

Section 6211(a) defines the term "deficiency". A deficiency is the amount by which the tax imposed exceeds the excess of--

> (1) the sum of
>
> > (A) the amount shown as the tax by the taxpayer upon his return, if a return was made by the taxpayer and an amount was shown as the tax by the taxpayer thereon, plus
> >
> > (B) the amounts previously assessed (or collected without assessment) as a deficiency, over--
>
> (2) the amount of rebates, as defined in subsection (b)(2), made. [Sec. 6211(a).]

Here, the $20,400 remitted by petitioner in 1984 was not "shown as the tax" on the Federal income tax return he filed for

1980.  It has not been previously assessed, or collected without assessment, "as a deficiency" for 1980, because at the time it was remitted, respondent had not made a determination of petitioner's tax liability.  See Conforte v. Commissioner, 74 T.C. 1160, 1204-1205 (l980), affd. in part, revd. in part and remanded 692 F.2d 587 (9th Cir. 1982).  In fact, no deficiency for 1980 was even proposed until 1994, 10 years after the remittance was made.  See Greene v. Commissioner, T.C. Memo. 1965-312.  Nor can it be a "rebate", which likewise requires that respondent have made a "substantive recalculation" of the tax owed.  O'Bryant v. United States, 49 F.3d 340, 342 (7th Cir. 1995); see also Lesinski v. Commissioner, T.C. Memo. 1997-234.  Instead, under settled principles, the $20,400 was merely a deposit, made well before any deficiency was proposed or determined.

A taxpayer's remittance will generally not be regarded as a payment of Federal income tax until the taxpayer intends that the remittance satisfy what the taxpayer regards as an existing tax liability.  See Risman v. Commissioner, 100 T.C. 191, 197 (1993) (citing Rosenman v. United States, 323 U.S. 658, 661-662 (1945)); Ewing v. United States, 914 F.2d 499, 503-504 (4th Cir. 1990); Fortugno v. Commissioner, 353 F.2d 429, 435 (3d Cir. 1965), affg. 41 T.C. 316 (1963).  "Until such time and absent such intent, a remittance by a taxpayer to respondent generally will be

regarded, not as a payment of tax, but merely as a deposit in the nature of a cash bond with respect to a tax liability that is to be determined at a later point in time." Risman v. Commissioner, supra at 197. Taxpayers make remittances "in the nature of a cash bond" in order to halt the accrual of interest liabilities on tax liabilities before they are assessed. See Rosenman v. United States, supra. The IRS specifically approves this procedure and accepts such deposits. See Rev. Proc. 82-51, 1982-2 C.B. 839, superseded by Rev. Proc. 84-58, 1984-2 C.B. 501. The procedures adopted by the IRS are "generally consistent" with court decisions addressing the topic of payment versus deposit. See Saltzman, IRS Practice & Procedure, par. 11.05[1][b], at 11-34 (2d ed. 1991).

Thus a taxpayer who makes a remittance before a tax liability has been ascertained is generally presumed to have intended to make a deposit. See Plankinton v. United States, 267 F.2d 278, 280 (7th Cir. 1959); Risman v. Commissioner, supra at 198-199. As the IRS explains in Rev. Proc. 82-51, 1982-2 C.B. at 840, at section 3.03(4)(1):

> (1) Any undesignated remittance not described in section 3.03 [i.e., payments made in response to a proposed liability] made before the written proposal of a liability, for example, the issuance of a revenue agent's or examiner's report, will be treated by the Service as a deposit in the nature of a cash bond. * * *

There is no evidence that, at the time the remittance was made, respondent had issued a "revenue agent's or examiner's report" or any other written proposal of a liability for 1980. Petitioner made the $20,400 remittance in April of 1984, some 16 months before respondent's agent made the preliminary indication of a $91,086 deficiency in the examination report dated July 24, 1985, and some 10 years before respondent determined the deficiency to be $43,750. Moreover, petitioner's remittance of $20,400 bore no perceptible relationship to either of these amounts. Petitioner himself could shed no further light on the nature of the remittance, indicating only that he may have made it to stop the running of interest. These factors are characteristic of a deposit in the nature of a cash bond; they are inconsistent with a finding that the remittance was actually a payment or was meant to be one. See Ewing v. United States, supra at 503.[4] We therefore conclude that the $20,400 was not, and was not intended to be, "an amount collected * * * as a deficiency" as to which we have jurisdiction under section 6211(a)(1)(B).

---

[4] We have taken into consideration the IRS payment posting voucher which contains a checked section indicating that the payment was a Code 640 "Advance payment on deficiency". The same voucher, however, bears the handwritten legend in the "remarks" section that the $20,400 serves as a "cash bond". The voucher thus supports either the payment or deposit interpretation, and accordingly it is not persuasive as to either. Cf. Ewing v. United States, 914 F.2d 499, 503 n.10 (4th Cir. 1990).

Because we conclude that the $20,400 remittance was a deposit with respect to the 1980 tax year, it has no effect upon the deficiency ultimately determined for petitioner in that year. We accordingly lack jurisdiction over that amount for 1980, the only taxable year before us in this proceeding. See Savage v. Commissioner, 112 T.C. 46 (1999).[5]

It follows that we need not address petitioner's proffer of additional evidence concerning the $20,400 remittance, or its return with interest. Petitioner again seeks to introduce the testimony of Ms. Mellerke. This time petitioner seeks to show that Wynne had stated "that she'd received a refund check that was intended for someone else, and she had signed the check and cashed it". Respondent objected to this testimony, asserting both that it is inadmissible hearsay and that it is irrelevant. Once again, we do not rule upon the hearsay objection, because we conclude that evidence that Wynne had taken the returned remittance for herself is not relevant here, where we have no jurisdiction to address issues relating to that remittance.

_____

[5] This $20,400 was refunded only after being credited to petitioner's 1982 tax account. When refunded, it included $902 as interest--apparently reflecting the accrual of interest for the 6 months that it had been credited to petitioner's 1982 tax liabilities. There is no evidence why respondent returned the $20,400; it may have been agreed to by petitioner's duly authorized representatives, or it may have been issued as the result of a mistake by the IRS. In any event, we lack jurisdiction over that amount, because petitioner's 1982 tax year is not before us in this proceeding.

In view of the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.